**In re L.T. RUTH COAL COMPANY, INC., Debtor.**

**L.T. RUTH COAL COMPANY, INC., Plaintiff,**

**v.**

**BIG SANDY COAL AND COKE COMPANY, INC. and Kentucky Chestnut Coals, Inc., Defendants.**

**Bankruptcy No. 84–00197.**
**Adv. No. 84–0137.**

United States Bankruptcy Court, E.D. Kentucky, at Lexington.

May 14, 1986.

D. Duane Cook, Brown, Todd & Heyburn, Lexington, Ky., for L.T. Ruth Coal Co., Inc.

Paul C. Combs, Combs & Combs, Prestonsburg, Ky., James R. Higgins, Jr., Middleton & Reutlinger, Louisville, Ky., for Big Sandy Coal and Coke Co., Inc.

L. Owen Doyle, Paintsville, Ky., for Kentucky Chestnut Coals, Inc.

## MEMORANDUM OPINION

JOE LEE, Bankruptcy Judge.

This matter is pending on—

1. the motion of the defendants to remand this action to the Floyd County Circuit Court, and,

2. the motion of the plaintiff debtor in possession to assume the mineral leases which are the subject of this action.

**FINDINGS OF FACT:**

On June 6, 1976 the defendant, Big Sandy Coal and Coke Company, entered into a lease with the defendant, Kentucky Chestnut Coals, Inc., whereby the latter was granted the "sole and exclusive right and privilege of mining and removing all the merchantable and mineable coal, lying and being in, upon and under" 4,407 acres of land in Floyd County, Kentucky. This lease (base lease) was for a term of ten years but at the election of the lessee was to be extended for a like term from time to time until all the "mineable and merchantable" coal has been removed. The term "mineable and merchantable" coal is defined in the lease to mean "coal, which when reached in the course of the lessee's operations hereunder, can be mined, prepared and sold at a reasonable profit by diligent and skillful management, and by the use of machinery and methods which at the time are appropriate, modern and efficient."

The base lease requires the lessee to pay a minimum royalty of $7.50 per acre per year in advance for each year of the term of the lease, such minimum royalty being recoupable from prepaid minimum royalties at the rate of $1.00 per ton or a percentage[1] of the gross selling price per ton to the ultimate consumer, whichever is greater on coal sold, shipped or used by the lessee.

Should the lessee fail to mine a sufficient amount of coal during the first five years of the lease to cause to accrue to the lessor royalty equal to the minimum royalty due, the minimum royalty was to increase to $15.00 per acre at the beginning of the sixth year of the lease.

Article Five of the lease provides as follows:

> **ARTICLE FIVE:** If for any year or years the Lessee shall pay said minimum royalties, and shall not have mined in such year or years a sufficient quantity of coal to produce at the said rate of tonnage royalty the said minimum then the Lessee may, during any of the next five years, make up such deficit by mining free from tonnage royalty a quantity of coal over and above the quantity required to equal the minimum royalty for such year or years, sufficient at such royalty rate to absorb such deficit, but no payment of tonnage royalties in excess of the annual minimum royalty for any year shall be credited against a deficiency of tonnage royalties under minimum royalty for any such subsequent year.

> . . . . .

> If, at the beginning of any lease year, the tonnage of coal which the Lessee has the right to mine free of royalty on account of prepaid royalties shall equal or exceed the estimated quantity of recoverable coal remaining in the leased premises, Lessee shall have the right to discontinue the further payments of any royalties so long as the quantity of coal on which royalties have been prepaid and is still recoverable by Lessee, free of royalty, as herein provided, shall equal or exceed the quantity of recoverable coal remaining in the leased premises, but if at any time the amount of coal so recov-

1.  8% of the gross selling price to the ultimate consumer for deep mined coal or 12½% for strip mined coal.

erable shall be more than the estimated quantity of recoverable coal remaining in the leased premises, Lessee shall resume the payment of tonnage royalty.

On June 8, 1979, the defendant Kentucky Chestnut Coals, Inc., with the approval of the defendant Big Sandy Coal and Coke Company, sublet to the plaintiff debtor all of Kentucky Chestnut's mining rights to the mineable and merchantable coal under the 4,407 acres covered by the base lease. The sublease was for a term of 27 years, but at the option of the lessee could be extended from year to year until such time as all the mineable and merchantable coal underlying the demised premises has been removed therefrom.

The plaintiff/debtor/sublessee agreed to pay to Big Sandy Coal and Coke Company tonnage and yearly royalty payments as called for by the base lease and to pay the sublessor Kentucky Chestnut advanced royalties of $50,000 recoupable from an overriding royalty of 50 cents per ton payable to the sublessor.

Both the base lease and the sublease contain forfeiture provisions as hereinafter indicated.

### Base Lease

**ARTICLE TWENTY–ONE:** In case the Lessee shall fail in the performance or observance of any of the terms, conditions, covenants, stipulations and agreements of this lease and such failure shall continue for a period of one month after Lessor shall have given written notice of such default to the Lessee, then, at the election of the Lessor, the leasehold interest hereby created, and all the rights and privileges of the Lessee hereunder, shall forthwith cease and determine, and the Lessor shall be entitled to re-enter said land and to exclude the Lessee therefrom and to hold said land as of its former estate, and the Lessor shall thereupon be entitled to hold such equipment and machinery as may have been placed upon the demised premises and as then may be there.

### Sublease
### ARTICLE FIVE: FORFEITURE OF SUBLEASE

In the event Lessee shall fail to pay any installment of royalties to Big Sandy Coal and Coke Company under the Base Lease or any installment of royalties due Lessor under this Sublease, or any other payments due hereunder within thirty (30) days of written Notice to Lessee of its failure to make said payment from the due date, or in case the Lessee shall fail in the performance or observance of any of the terms, conditions, covenants or agreements under this Sublease, or Base Lease then in the election of Lessor in either such case, this Sublease and the Leasehold Estate hereby created and all the rights of Lessee under this Sublease shall become forfeited and Lessor shall have the right, without further Notice, to reenter the demised premises and take possession of all property thereon, to exclude Lessee therefrom, and to hold and possess the demised premises.

On June 6, 1983, Big Sandy Coal and Coke Company, by counsel, sent a notice of default and impending termination to the defendant Kentucky Chestnut Coals, Inc., as follows:

Default having been made in payment of royalties as provided in the Indenture of Lease between Big Sandy Coal and Coke Company and you dated June 8, 1976, you are hereby notified that unless said royalties through June 8, 1983 are paid on or before July 15, 1983, Big Sandy Coal and Coke Company *will terminate* the aforesaid lease and take possession of the leased premises as provided for in ARTICLE TWENTY of said Lease, and will take such steps as it may be advised to protect its interest in the premises. (Emphasis supplied).

. . . . .

On July 18, 1983, before Big Sandy Coal and Coke Company terminated the base lease, the debtor, L.T. Ruth Coal Company, commenced an action in the Floyd Circuit Court against the defendants Big Sandy

Coal and Coke Company and Kentucky Chestnut Coals, Inc. alleging that the debtor ceased making payments to the defendant Big Sandy Coal and Coke Company in May 1982 pursuant to Article Five of the Base Lease because after the lease year commencing June 6, 1982 the debtor became entitled to mine the leasehold free of royalty due to the fact that royalties prepaid by the debtor equal or exceed the estimated quantity of recoverable coal remaining in the leased premises. The debtor sought a declaratory judgment finding that it is not in default in royalty payments under the terms of the base lease and that it remains in valid possession of the leased premises.

Thereafter, on March 16, 1984, the plaintiff/debtor/sublessee, L.T. Ruth Coal Company, filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this court.

On June 11, 1984, the plaintiff/debtor in possession filed an application in the bankruptcy court to remove this declaratory judgment action from the Floyd County Kentucky Circuit Court to this court.

On September 7, 1984 the defendant lessor Big Sandy Coal and Coke Company filed an objection to removal and motion for remand and an alternative motion to compel early assumption or rejection by the debtor of the base lease involved in this removed adversary proceeding.

On October 4, 1984, the defendant sublessee Kentucky Chestnut Coals, Inc. moved the court to require the debtor within 30 days to either assume and provide reasonable assurance for the payment of all sums due and to become due under the sublease agreement dated June 8, 1979, between the movant and the debtor, or to reject the lease.

Following a hearing on October 17, 1984, on the aforementioned motions the parties submitted an agreed order which provided the debtor must assume the base lease with Big Sandy and the sublease with Kentucky Chestnut on or before November 16, 1984 in compliance with section 365 of the Bankruptcy Code.

The agreed order further provided that "if the debtor assumes said lease and sublease, the debtor shall (a) comply with all the provisions and requirements of Section 365 of the Bankruptcy Code simultaneously with its decision to assume said lease and sub-lease...." The order also fixed the time within which the parties were to file briefs on the issues raised by the pending motions of Big Sandy and Kentucky Chestnut to remand this matter to the state court.

On November 16, 1984 the debtor filed with the court a motion for approval of its assumption of the base lease with Big Sandy and sublease with Kentucky Chestnut alleging the leases are necessary for the successful reorganization of the debtor, and that the debtor has expended funds in maintaining permits necessary to mine the leases. The debtor further alleges in its motion for approval of assumption of the leases that the debtor "is not delinquent in the payment of any royalties or rents regarding the leases," because by the terms of the leases, debtor is entitled to mine free of any royalties or rents so that it may recoup previously paid minimum royalties.

The debtor prays that it be permitted to assume said unexpired leases, that it not be required to cure, compensate, or provide adequate assurance for its performance of the leases; that Big Sandy and Kentucky Chestnut are not entitled to the foregoing because the debtor is not in default under the leases, and that the debtor have such further relief as is just.

In this removed adversary proceeding Big Sandy has counterclaimed for a declaration that the base lease is terminated, damages in the amount of $198,000.00, and a $66,000.00 royalty for each year after June 8, 1983. Kentucky Chestnut has counterclaimed for $175,000.00. These counterclaims are disputed state-law based claims against the debtor's estate for breach of contract. Neither of these defendants has filed a motion for relief from stay in conformity with Bankruptcy Rules 4001 and 9014.

■ There is an issue as to whether the escape hatch provision in the base lease relied on by the debtor in possession relieves the debtor from payment of annual royalties to the defendant Kentucky Chestnut Coals under the sublease. The court finds that the interrelationship between the base lease and sublease is a question of fact that should not be disposed of on the pleadings as a matter of law.

■ Because there is diversity of citizenship between the lessor Big Sandy and the lessee Kentucky Chestnut and the debtor sublessee, Big Sandy could have commenced an action to cancel these leases in the U.S. district court prior to bankruptcy. For this reason and because 28 U.S.C. § 1334(c)(2) does not apply in cases or proceedings pending on the date of enactment, July 10, 1984, Pub.L. No. 98–353, § 122(b), this is not a matter requiring mandatory abstention.

According to statistics compiled by the Administrative Office of Courts of the Commonwealth of Kentucky the average time required to conclude a civil case in the Floyd Circuit Court is 33.8 months.

**CONCLUSIONS OF LAW:**

The issue raised by the motion of the debtor in possession to assume the mineral leases of the debtor with the defendants is essentially identical to the issue raised by the prebankruptcy complaint of the debtor in the declaratory judgment action in the state court which has been removed to this court.

In its motion to assume the mineral leases the debtor in possession asserts that to the best of its knowledge the debtor is not delinquent in the payment of any rents or royalties due under the leases, that by the terms of the leases the debtor is entitled to mine free of any royalties or rents in order that it may recoup prepaid minimum royalties; therefore, the debtor in possession should be permitted to assume the leases without condition because the requirements of 11 U.S.C. § 365(b)(1) that the debtor in possession cure default, compensate the defendants for any actual pecuniary loss to them resulting from default and provide them adequate assurance of future performance are inapplicable.

By its complaint in this removed declaratory judgment action the debtor seeks a determination that it was authorized to discontinue payment of royalties pursuant to Article Five of the base lease because the quantity of recoverable coal remaining in the leased premises is less than the quantity of coal for which it has prepaid royalties. The debtor seeks a judgment finding that the defendants are wrongfully attempting to terminate their leases and that it is entitled to mine coal from the premises without payment of further royalties.

Clearly the issue to be decided is the proper interpretation of relevant provisions of the leases under applicable state law (a state law contract question) whether that issue is decided in the context of the motion of the debtor in possession under the Bankruptcy Code to assume the leases or in the context of the debtor's declaratory judgment action removed to and now pending in this court seeking a determination that the debtor is not in default under the leases.

The motion of the debtor in possession to assume the debtor's mineral leases with the defendants is a proceeding arising under title 11 as well as a proceeding arising in a case under title 11. 11 U.S.C. § 365(a); Bankruptcy Rule 6006.

This case presents in rather clear focus the fact that determination of issues in a so-called core bankruptcy proceeding frequently involves adjudication of the rights of the parties as fixed by contract or state law prior to the intervention of bankruptcy. This initial adjudication of the rights of the parties under state law is a predicate to determination of their rights under federal law.

By pleadings appropriate at the time they were filed the defendants have contested the jurisdiction of the bankruptcy court to adjudicate their rights in this adversary proceeding. It would be an anomaly if the bankruptcy court is without jurisdiction to adjudicate the rights of the parties in this adversary proceeding, but is

vested with jurisdiction to determine the rights of the parties in conjunction with the motion of the debtor in possession for an order authorizing it to assume the leases of the debtor with the defendants.

In an opinion in *In re Lawson,* 42 B.R. 206, 216 (Bankr.E.D.Ky.1984), this court questioned the constitutionality of the jurisdictional provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984, 28 U.S.C. § 157, but did not rule on the matter.

On appeal in that case the district court ruled as follows:

> The appellant creditor challenges in part the constitutionality of the Bankruptcy Amendments and Federal Judgeship Act of 1984 (hereinafter the "Act") and asserts that the bankruptcy judge lacks jurisdiction to declare a state law invalid. The Attorney General of the United States intervened on the appeal and filed a lengthy memorandum in support of the validity of the statute. The court is of the opinion that the Act is constitutional for the reasons stated by the Attorney General and empowers the bankruptcy judge to pass on the constitutionality of the state statute.

*Credithrift of America v. Lawson,* 52 B.R. 369 (E.D.Ky.1985) (order reversing decision of bankruptcy judge).

This court is concerned about the fact that in the *Lawson* case the district court was not made aware of important and relevant communications from the Office of the Attorney General of the United States to Congress advising of the possible unconstitutionality of 28 U.S.C. § 157 and suggesting an amendment to cure any constitutional defects. These communications, which are attached as Exhibits 1, 2 and 3 to this opinion, express concern that the jurisdictional provisions of the Bankruptcy Amendments and Federal Judgeship Act of 1984 may be unconstitutional on two grounds: (1) because of the failure to provide for *de novo* review by the district

court of orders of the bankruptcy judge in so-called core proceedings, and (2) because the definition of core proceedings may be too expansive.

Also, after the appeal in the *Lawson* case was submitted to the district court, the Supreme Court in its opinion in *Thomas v. Union Carbide Agric. Products Co.,* 473 U.S. 568, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), rejects one of the basic tenets of the Kastenmeier Amendment, *infra,* which is that Article III has no force with respect to matters arising wholly under federal law. *Id.* at ——, 105 S.Ct. at 3335–36, 87 L.Ed.2d at 423.

This court is also disappointed by the fact that no court to date has articulated the grave threat to the continued existence and vitality of the Article III court system posed by 28 U.S.C. § 157(b). We must be ever vigilant to prevent the undermining in the interest of expediency of Article III values which are so important to the protection of the individual freedom and property rights of the people of this nation.[2]

It seems appropriate to commence an analysis of the provisions of 28 U.S.C. § 157(b) with a discussion of the history of the Kastenmeier Amendment, which was enacted as Title I of the Bankruptcy Amendments and Federal Judgeship Act of 1984. This will be followed by a discussion of Mr. Kastenmeier's explanation of the jurisdictional provisions of his amendment. Thereafter we shall proceed with a detailed analysis of the arguments of the Attorney General of the United States in favor of the constitutionality of the jurisdictional provisions of the Kastenmeier Amendment, which permits non-tenured bankruptcy judges to enter final judgments and orders in so-called core bankruptcy proceedings without the consent of the parties and subject only to traditional appellate review by the Article III district court.

■ It is the conclusion of this court that 28 U.S.C. § 157(b) is patently unconstitution-

---

**2.** Comment, *The Boundaries of Article III: Delegation of Final Decisionmaking Authority to Magistrates,* 52 U.Chi.L.Rev. 1032 (1985). The author suggests there are Article III values not yet enunciated by the courts.

al in application, and this court would so hold if it were not precluded from doing so by the aforementioned decision of the district court in the *Lawson* case.

Moreover, this court also believes the Kastenmeier Amendment, insofar as it relates to so-called core bankruptcy proceedings, may well be inherently unconstitutional because, as we shall demonstrate, it is predicated in part on the assumption that administrative control over cases and over subordinate judicial officers who adjudicate such cases is for purposes of compliance with the requirements of Article III of the Constitution equivalent to plenary review of the factual determinations of such subordinate judicial officers.

## I. A Short History of the Kastenmeier Amendment

The Kastenmeier Amendment, which was adopted by the House of Representatives on March 21, 1984, had its genesis in H.R. 7132 introduced in the 97th Congress by Congressman Kastenmeier and reintroduced by him as H.R. 1401 in the 98th Congress. 128 Cong.Rec. H7173 (daily ed. Sept. 16, 1982); 129 Cong.Rec. H512 (daily ed. Feb. 10, 1983).

The Subcommittee on Monopolies and Commercial Law of the House Judiciary Committee, of which Mr. Kastenmeier is a member, on February 2, 1983, held a hearing on H.R. 3, a bill co-sponsored by Congressmen Rodino and Fish, which, in an attempt to comply with the decision of the Supreme Court in *Northern Pipeline Construction Co. v. Marathon Pipe Line Company*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), proposed reconstitution of the bankruptcy courts as Article III courts. On February 10, 1983 the subcommittee favorably reported the Rodino-Fish bill. Later that same day Congressman Kastenmeier reintroduced his proposal as H.R. 1401. 129 Cong.Rec. H512 (daily ed. Feb. 10, 1983).

The House Judiciary Committee met on February 15, 1983 to consider the Rodino-Fish bill. On this occasion Congressman Kastenmeier did not offer the proposal embodied in H.R. 1401 in the form of an amendment as a possible alternative to the court structure provided for by the Rodino-Fish bill. Mr. Kastenmeier did offer an amendment providing for the appointment by the President of 94 Article III bankruptcy judges, one in each judicial district, and for the appointment of Bankruptcy administrators to assist these judges in handling "uncontested matters." This amendment, which was patterned after S.443 which had been introduced by Senator Dole on February 3, 1983, and by Congressman Kastenmeier on February 10, 1983 as H.R. 1420, 129 Cong.Rec. H512 (daily ed. Feb. 10, 1983), was defeated by voice vote. The Rodino-Fish bill was reported favorably by the House Judiciary Committee on February 15, 1983 by a vote of 24–6.

Because H.R. 1401 [3] was introduced after the Subcommittee on Monopolies and Commercial Law had completed its work on the Rodino-Fish bill, no hearings were ever held on this original proposal of Congressman Kastenmeier or any of its progeny.

The Rodino-Fish bill was forwarded by the Committee on the Judiciary to the House Rules Committee in March, 1983, where the bill languished for a full year until March, 1984. [4]

Meanwhile, on April 27, 1983, the Senate passed S.1013, a bill to amend title 28 of the United States Code regarding jurisdiction in bankruptcy proceedings. This bill left intact the provision for appointment of bankruptcy judges for 14–year terms by the President and continued in existence the bankruptcy court for each district as an adjunct of the district court. Section 1471 of title 28, United States Code, was revised to provide that all cases under title 11 and all civil proceedings arising under title 11, or arising in or related to cases under title 11 were referred to the bankruptcy court

---

**3.** For the most part H.R. 1401 was limited to a recasting of 28 U.S.C. § 1491 to insert a provision for recall of cases by the district court.

**4.** 130 Cong.Rec. H1797 (daily ed. Mar. 21, 1984).

for the district subject to the right of the district court on its own motion or on motion of a party to recall any civil (sic) case or proceeding. The district court in its discretion could deny a motion to recall, except with respect to a proceeding involving a cause of action not arising under title 11 or not arising in a case under title 11 or that required consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce. These exceptions were apparently intended to restrict the jurisdiction of the bankruptcy court with respect to so-called "related" matters and in proceedings involving the rejection of collective bargaining agreements. Upon recall the district court could determine the entire case or in its discretion refer a proceeding to either a bankruptcy judge or a magistrate to make findings and recommendations for disposition of the matter, unless a party in interest in a "related" proceeding timely requested the district court to abstain, in which event the court was required to abstain if, absent bankruptcy, the action was one that could not have been brought in the district court and an action to adjudicate such claim had been or would be timely instituted and prosecuted in a state forum of appropriate jurisdiction. Otherwise, abstention by the district court with respect to a particular proceeding arising under title 11 or arising in or related to a case under title 11 was discretionary. See 130 Cong.Rec. S.5310, S.5364–68 (daily ed. April 27, 1983).

On June 8, 1983, Congressmen Kindness and Kastenmeier, as co-sponsors, introduced H.R. 3257, a bill to restructure the bankruptcy court system. 129 Cong.Rec. H3787 (daily ed. June 8, 1983). This bill paralleled in some respects the aforementioned Senate bill, except the power to appoint bankruptcy judges was vested in the courts of appeals instead of the President and jurisdiction was conferred on the district court by revision of 28 U.S.C. § 1334 instead of § 1471. Also the provision for referral of cases and proceedings to bankruptcy judges was placed in a new section 157 of title 28, and rather than being ac-

complished by statute was to be implemented by local rule or order. In this bill the bankruptcy court was constituted as a "department" of the district court. See H.R. 3257, 98th Cong., 1st Sess.; 129 Cong.Rec. H3787 (daily ed. June 8, 1983).

Approximately eight months later, on February 27, 1984, in the Second Session of the 98th Congress, Congressman Kindness introduced the foregoing bill as a proposed amendment in the nature of a substitute for H.R. 3, the Rodino-Fish bill that was still pending before the House Rules Committee. 130 Cong.Rec. H917–26 (daily ed. Feb. 27, 1984).

It is interesting to note that even at this late juncture, which was approximately three weeks prior to passage of the Kastenmeier Amendment, the core/non-core distinction between matters that were to be handled by bankruptcy judges and those that were to be handled by district judges had not yet surfaced.

A few days later on March 6, 1984, Congressman Kindness introduced a modified version of H.R. 3257 as an amendment in the nature of a substitute for H.R. 3, the Rodino-Fish bill. This amendment defined the bankruptcy court as a "unit" instead of as a "department" of the district court and for the first time introduced the concept of core/non-core proceedings as a proposed basis for jurisdictional distinction of matters that could be finally resolved by non-Article III bankruptcy judges without the consent of the parties and subject only to traditional appellate review. 130 Cong. Rec. H1341–43 (daily ed. Mar. 6, 1984). This was approximately 15 days prior to adoption of the Kastenmeier Amendment.

On March 20, 1984, the Kindness proposal of March 6, 1984 was reintroduced in the House by Congressman Kastenmeier, this time as an amendment in the nature of a substitute for Title I of H.R. 5174, the new number assigned to former H.R. 3 after addition of a Title II containing amendments to the Bankruptcy Code. 130 Cong. Rec. H1789–92 (daily ed. Mar. 20, 1984). This amendment, introduced the day before

enactment, contains the core/non-core dichotomy that provides the jurisdictional gauntlet of present law. The primary explanation of the Kastenmeier Amendment appears in the extension of remarks of Congressman Kastenmeier published in the Congressional Record the day the amendment was introduced, which as previously stated was the day before the amendment was enacted into law. See 130 Cong.Rec. E1107–10 (daily ed. Mar. 20, 1984).

The purpose of this short history is merely to refute any suggestion that Congress was well informed at the time it voted on the Kastenmeier Amendment. Successful adoption of the amendment was achieved in large measure by parliamentary gamesmanship that sheltered the proposal from scrutiny by constitutional law experts and those knowledgeable in the field of bankruptcy law.

Certainly the Kindness/Kastenmeier team and the attorneys in the Administrative Office of the United States Courts and in the employ of the Ninth Circuit who drafted this legislation for the congressmen, as well as the many Article III judges who, without ever having seen or studied the proposal, wrote or called their congressmen urging them to support the Kastenmeier Amendment, were all well intentioned. There is little reason to suspect the promoters of this legislation realized the proposal is a loaded gun aimed at the head, heart and soul of the Article III court system, as we shall hereinafter demonstrate in this opinion.

## II. Analysis of Mr. Kastenmeier's Explanation of His Amendment

In the explanation of his amendment appearing in his Extension of Remarks, Mr. Kastenmeier asserts that "approximately 95 percent of all proceedings [controversies arising under title 11 or arising in cases under title 11 or related to cases under title 11] may be decided by [non-Art. III] bankruptcy judges either because they [such proceedings] involve wholly Federal law questions or because the State law issues involved are merely incidental to core bank-

ruptcy proceedings." 130 Cong.Rec. 1109, col. 3 (daily ed. Mar. 20, 1984).

It is true that in his dissenting opinion in the *Northern Pipeline* case Mr. Justice White wrote "The plurality concedes that Congress may provide for initial adjudications by Article I courts or administrative judges of all rights and duties arising under otherwise valid federal laws." *Northern Pipeline Construction Co. v. Marathon Pipe Line Company*, 458 U.S. 50, 94, 102 S.Ct. 2858, 2883, 73 L.Ed.2d 598, 630 (1982).

However, Mr. Kastenmeier and his researchers, presumably relying on the foregoing statement by Justice White, apparently overlooked the fact that the proposition that non-Article III judges may decide finally the rights of parties in controversies that involve wholly federal law questions is specifically rejected in footnote 32 to the plurality opinion in the *Northern Pipeline* case as follows:

Contrary to Justice White's suggestion, we do not concede that "Congress may provide for initial adjudications by Article I courts or administrative judges of all rights and duties arising under otherwise valid federal laws."

458 U.S. 50, 81 n. 32, 102 S.Ct. 2858, 2876 n. 32.

If Mr. Kastenmeier were correct in his assertion [that all proceedings that involve wholly federal law questions may be determined finally by non-Article III judges] without the consent of the parties there would be no need for Congress to maintain or create Article III district or circuit judgeship positions to accommodate most litigation filed under 28 U.S.C. § 1331, which confers on the district courts jurisdiction of civil actions arising "under the Constitution, laws or treaties of the United States." All such litigation arising under the laws, as distinguished from that arising under the Constitution, of the United States could be finally determined at the trial court level by non-Article III judges. This proposition asserted by Mr. Kastenmeier is somewhat inconsistent with the fact that a substantial number of new Arti-

cle III-judgeship positions were included in the Bankruptcy Amendments and Federal Judgeship Act of 1984, ostensibly to handle just such litigation.

To illustrate the breadth of the proposition asserted by Mr. Kastenmeier we will catalog some of the kinds of actions that could be determined finally by non-Article III judges if he were correct. Included would be federal anti-trust actions, suits based on laws governing banks and banking, suits based on interstate commerce laws and regulations, suits to enforce compliance with federal environmental laws, suits based on federal agricultural laws, the Food and Drug Act, the Occupational Safety and Health Act, the Fair Labor Standards Act, the Railway Labor Act, the Freedom of Information Act, suits based on securities fraud or laws governing securities and commodities exchanges, and suits to determine property rights under copyright, patent or trademark laws. This list is illustrative and by no means exhaustive.

This would appear to encompass more than one half of the civil cases commenced annually in the United States district courts. See *Federal Judicial Workload Statistics During the twelve month period ended September 30, 1985,* at A–8 to A–13.[5]

If there is no reason to maintain an Article III court system to adjudicate such matters at the trial court level there is no reason to maintain an Article III appellate court system to hear appeals in such matters. Mr. Kastenmeier has laid the groundwork for a parallel non-Article III trial and appellate court system to handle most federal civil litigation. Surely there are those who would want to expand and nourish such a system in preference to the present Article III system, which in turn could be permitted to wither and fade into obscurity.

If the proposition advanced by Mr. Kastenmeier were correct the trauma experienced by the Ninth Circuit Court of Appeals in its opinions which we shall denominate as Pacemaker One [6] and Pacemaker Two [7] could have been avoided.

Pacemaker Diagnostic Clinic of America, Inc. charged Instromedix, Inc. with infringement of a patent. Instromedix denied infringement and alleged that the patent was invalid. The parties consented to have the case tried by a magistrate sitting without a jury. The magistrate found the patent valid, but not infringed. Both parties appealed to the Ninth Circuit. That court on its own motion raised the issue of the constitutionality of 28 U.S.C. § 636(c), which empowers a magistrate, with the consent of the parties, to conduct all pro-

---

5. Civil cases commenced during the 12 month period ended 9–30–85.

$$\begin{array}{ll} \text{Total} = 278{,}681 \\ \text{Federal question} = & 93{,}023 \\ \text{U.S. plaintiff} = & 81{,}401 \\ \text{U.S. defendant} = & \underline{38{,}329} \\ & 212{,}753 \end{array}$$

$\dfrac{212{,}753}{278{,}681}$ = 77.3% of all civil cases are federal question or involve the U.S. as plaintiff or defendant

$\dfrac{93{,}023}{278{,}681}$ = 34.4% of all civil cases involve federal question jurisdiction between private parties

$\dfrac{174{,}424}{278{,}681}$ = 60.5% of all civil cases involve federal question jurisdiction or the U.S. as plaintiff

---

Information from Table C–2, page A–8, *Federal Judicial Workload Statistics During the twelve month period ended September 30, 1985,* prepared by the Administrative Office of the United States Courts Statistical Analysis and Reports Division.

6. *Pacemaker Diagnostic Clinic, Inc. v. Instromedix, Inc.,* 712 F.2d 1305 (9th Cir.1983), *reh'g en banc granted Pacemaker Diagnostic Clinic v. Instromedix, Inc.,* 718 F.2d 971 (9th Cir.1983).

7. *Pacemaker Diagnostic Clinic v. Instromedix, Inc.,* 725 F.2d 537 (9th Cir.1984), *cert. denied,*

ceedings in a civil case and to order entry of a judgment.

The members of the original and the subsequent *en banc* panel of judges of the Ninth Circuit Court of Appeals that considered the appeal in this case recognized that the issues in the case involved wholly federal law questions.

In footnote 8 to the opinion in *Pacemaker* One the court said—

> 8. The parties note that the underlying dispute here concerns patent law. The plurality in *Northern Pipeline* conceded the ability of Congress to create article I courts in certain specialized areas. For example, in the case of courts martial, the political branches of government possess extraordinary, constitutionally recognized control over the subject matter at issue. U.S. Const. art. I, § 8, cls. 13, 14, art. II, § 2, cl. 1, amend. V. Congress' power to grant patents is also explicitly authorized in the Constitution. U.S. Const. art. I, § 8, cl. 8. The plurality refused, however, to allow Congress to set up non-article III legislative courts pursuant to all of its enumerated powers. For example, the power to regulate bankruptcies is also committed to Congress in the Constitution, U.S. Const. art. I, § 8, cl. 4, but the plurality still rejected the bankruptcy courts as special legislative courts.
>
> Secondly, it is only coincidental that this case concerns patents. Magistrates have the power to try any jury or nonjury civil matter, not just patent cases. 28 U.S.C. § 636(c)(1).

712 F.2d 1305, 1309 n. 8.

The court in *Pacemaker* Two observed—

> At the outset, and leaving aside all consideration of criminal cases, we recognize the principle that parties to a case or controversy in a federal forum are entitled to have the cause determined by

Article III judges, with some significant exceptions yet to be fully delineated by the Supreme Court. *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (plurality opinion); id. at 89, 102 S.Ct. at 2881 (Rehnquist, J., concurring). We decide the case before us on the further premise that the patent suit here falls within none of the recognized or potential exceptions, even the public rights exception. Id. at 67–76, 102 S.Ct. at 2869–2874. Though no authority we have found expressly so holds, it is appropriate to address the constitutional issue in this patent case. The statutory provision for reference to magistrates applies, without qualification, to all civil cases, and the issue will arise in other matters that do not arguably qualify as a case involving federally created rights. In its recent decision upholding the statute, the Third Circuit adopted the same approach to reach the constitutional issue. See *Wharton-Thomas v. United States*, 721 F.2d 922, 930 (3d Cir.1983).

725 F.2d 537, 541.

The Third Circuit *Wharton-Thomas* case referred to in the above quotation involved a suit by an individual against the United States under the Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80 (1976 & Supp. V 1981). The action arose wholly under federal law. The court refused to address the argument that a Tort Claims Act case need not be decided initially by an Article III court.[8]

Thus, subsequent to the decision of the Supreme Court in the *Northern Pipeline* case and prior to Mr. Kastenmeier's representations to Congress in his extension of remarks that a non-Article III judge can determine and enter final judgments in proceedings that involve wholly questions of federal law, two circuit courts had declined to bite this big red apple that Congressman

469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984).

**8.** The court expressed concern about the possibility of large-scale dilutions of district courts to the point where magistrates may outnumber district judges. 721 F.2d 922, 930. Of greater

concern should be the fact that non-Article III judicial officers (bankruptcy judges and magistrates) may now finally adjudicate more civil litigation in the federal courts than do Article III judges who must comply with the constraints of the Speedy Trial Act in criminal cases.

Kastenmeier dangled before Congress. Unfortunately, Congress did bite.

Perhaps the courts that refused to bite realized the obvious, that the adoption of such a rule of law might toll the death knell for the Article III court system as we now know it.

To support his argument that a non-Article III judge may determine finally any proceeding that arises wholly under federal law Mr. Kastenmeier cites the following excerpt from the plurality opinion of the Supreme Court in *Northern Pipeline Construction Company v. Marathon Pipe Line Company.*

> [W]hen Congress creates a statutory right, it clearly has the discretion, in defining that right, to create presumptions, or assign burdens of proof, or prescribe remedies; it may also provide that persons seeking to vindicate that right must do so before particularized tribunals created to perform the specialized adjudicative tasks related to that right. Such provisions do, in a sense, affect the exercise of judicial power, but they are also incidental to Congress' power to define the right that it has created. 458 U.S. at 83 [102 S.Ct. at 2878].

130 Cong.Rec. E1109, col. 1 (daily ed. Mar. 20, 1984).

Actually, this quote relied upon by Mr. Kastenmeier is taken out of context. The full paragraph from which the quote is taken reads as follows:

> Although *Crowell* [*v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ] and [*U.S. v.* ] *Raddatz* [447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ] do not explicitly distinguish between rights created by Congress and other rights, such a distinction underlies in part *Crowell*'s and *Raddatz*'s recognition of a critical difference between rights created by federal statute and rights recognized by the Constitution. Moreover, such a distinction seems to us to be necessary in light of the delicate accommodations required by the principle of separation of powers reflected in Art. III. The constitutional system of checks and balances is de-

signed to guard against "encroachment or aggrandizement" by Congress at the expense of the other branches of government. *Buckley v. Valeo,* 424 U.S. [1], at 122 [96 S.Ct. 612, 683, 46 L.Ed.2d 659 (1976) ]. But when Congress creates a statutory right, it clearly has the discretion, in defining that right, to create presumptions, or assign burdens of proof, or prescribe remedies; it may also provide that persons seeking to vindicate that right must do so before particularized tribunals created to perform the specialized adjudicative tasks related to that right. Such provisions do, in a sense, affect the exercise of judicial power, but they are also incidental to Congress' power to define the right that it has created. *No comparable justification exists, however, when the right being adjudicated is not of congressional creation. In such a situation, substantial inroads into functions that have traditionally been performed by the judiciary cannot be characterized merely as incidental extensions of Congress' power to define rights that it has created. Rather, such inroads suggest unwarranted encroachments upon the judicial power of the United States, which our Constitution reserves for Art. III courts.* (Emphasis supplied).

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 83–84, 102 S.Ct. 2858, 2877–2878, 73 L.Ed.2d 598 (1982).

What Mr. Kastenmeier does not appear to comprehend is that many, perhaps most, rights adjudicated in core bankruptcy proceedings *are not of congressional creation. Vanston Bondholders Protective Com. v. Green,* 329 U.S. 156, 161, 170–171, 67 S.Ct. 237, 239, 243–244, 91 L.Ed. 162 (1946). As will be noted later in this opinion, the Bankruptcy Code for the most part merely attaches consequences, federally defined, to rights created under state law.

When a debtor invokes relief under the Bankruptcy Code all state law claims and causes of action which the debtor may possess against third parties become property

of the estate. Certain causes of action that creditors have under state law may also be asserted by the trustee. 11 U.S.C. §§ 523, 541, 544(b). Thereafter, such claims and causes of action are assertable by the trustee in behalf of the estate. Claims and causes of action which third parties have against the debtor must be asserted against the estate rather than against the debtor, and are no longer enforceable as personal liabilities of the debtor to the extent that such claims are dischargeable. 11 U.S.C. §§ 362(a), 524(a) and (c). But this substitution by operation of law of parties by or against whom claims or causes of action may be asserted does not effectuate a change in the origin of such claims or causes of action. Such claims or causes of action arise under state law rather than bankruptcy law and are not rights created by Congress.

The Supreme Court acknowledged this fact in the plurality opinion in the *Northern Pipeline* case as follows:

> *Many of the rights subject to adjudication by the Act's bankruptcy courts, like the rights implicated in Raddatz, are not of Congress' creation.* Indeed, the cases before us, which center upon appellant Northern's claim for damages for breach of contract and misrepresentation, involve a right created by *state* law, *a right independent of and antecedent* to the reorganization petition that conferred jurisdiction upon the Bankruptcy Courts. Accordingly, Congress' authority to control the manner in which that right is adjudicated, through assignment of historically judicial functions to a non-Art. III "adjunct," plainly must be deemed at a minimum. Yet it is equally plain that Congress has vested the "adjunct" bankruptcy judges with powers over appellant's state-created right that far exceed the powers that it has vested in administrative agencies that adjudi-

cate only rights of Congress' own creation. (Emphasis supplied).

458 U.S. 50, 84, 102 S.Ct. 2858, 2878.

As subsequently noted by the Supreme Court in the *Thomas* case, a statute that displaces a traditional cause of action and affects a pre-existing relationship based on common law clearly falls within the range of matters reserved to Article III courts under the holding of *Northern Pipeline. Thomas v. Union Carbide Agric. Products Co.,* 473 U.S. 568, ——, 105 S.Ct. 3325, 3336–37, 87 L.Ed.2d 409, 424 (1985).[9]

Even with respect to those few kinds of core bankruptcy proceedings wherein the rule of decision is completely prescribed by federal law, the *Thomas* case has surely put to rest the contention of Mr. Kastenmeier that a non-Article III bankruptcy judge may decide finally wholly federal law questions without the consent of the parties and subject only to traditional appellate review. The Court said:

> Nor did a majority of the court [in *Northern Pipeline* ] endorse the implication of the private right/public right dichotomy that Article III has no force simply because a dispute is between the Government and an individual.

*Id.,* 473 U.S. at ——, 105 S.Ct. at 3335–36, 87 L.Ed.2d at 423.

We now know on no less authority than the Supreme Court that Mr. Kastenmeier erred in advising Congress that it could constitutionally provide for initial adjudication by non-Article III bankruptcy judges of all rights and duties that involve wholly federal law questions. Moreover, as previously indicated, most rights that are subject to adjudication in a bankruptcy proceeding arise prepetition under state law rather than under federal law and generally do not involve controversies between the Government and individuals, but rather involve controversies between private parties.

---

**9.** Most importantly, the statute in *Crowell* displaced a traditional cause of action and affected a pre-existing relationship based on a common-law contract for hire. Thus it clearly fell within the range of matters reserved to Article III courts under the holding of *Northern Pipeline. Thomas v. Union Carbide Agric. Products Co.,* 473 U.S. 568, ——, 105 S.Ct. 3325, 3336–37, 87 L.Ed.2d 409, 424.

We do not pretend to understand what Mr. Kastenmeier means when he says controversies arising under title 11 or arising in cases under title 11 that involve state law issues can be decided by bankruptcy judges "because the State law issues involved are merely incidental to core bankruptcy proceedings." This appears to be exactly the kind of reasoning that was specifically rejected by the Supreme Court in the *Northern Pipeline* case.

> When the right being adjudicated is not of congressional creation ... substantial inroads into functions that have traditionally been performed by the Judiciary cannot be characterized merely as incidental extensions of Congress' power to define rights that it has created.

458 U.S. 50, 83–84, 102 S.Ct. 2858, 2857–2858.

Elsewhere in his extension of remarks Congressman Kastenmeier says:

> State law rights arising in core bankruptcy proceedings are functionally equivalent to congressionally created rights, because Congress has the power to modify State law rights in bankruptcy proceedings. Unlike the States, Congress may impair the obligations of contracts through the bankruptcy clause. Indeed, the very purpose of bankruptcy is to modify the rights of the debtors and creditors, and the bankruptcy code authorizes the bankruptcy court to abrogate or modify State-created obligations in many ways.

130 Cong. Rec. E1110, col. 1 (daily ed. Mar. 20, 1984).

Mr. Kastenmeier cites no authority for the proposition that state law rights arising in bankruptcy proceedings are functionally equivalent to congressionally-created rights.

Modification or abrogation in bankruptcy proceedings of a creditor's rights under state law would appear to be the antithesis of, rather than the equivalent of, a right created by Congress.

Congress has in numerous instances throughout the Bankruptcy Code adopted state law as the basis for determining the rights of a debtor's estate *vis-a-vis* the debtor, creditors of the debtor, or obligors of the debtor, as well as the rights of these parties with respect to each other. A claim against a debtor's estate is allowable as of the date of the filing of a petition for relief under the Bankruptcy Code only to the extent that such claim is enforceable under any agreement or applicable law (generally state law) on such date. 11 U.S.C. §§ 101(4), 502(b)(1). A debtor's exemptions may be determined by reference to state law. 11 U.S.C. § 522(b). A trustee in bankruptcy is empowered to avoid a transfer of property of the debtor to the extent that such transfer is avoidable under applicable state law by a judicial lien creditor or by a creditor holding an unsecured claim against the debtor. 11 U.S.C. § 544(a) and (b). State law may be determinative of such questions as whether a transfer of property of the debtor was effectuated, when the transfer occurred, or whether the transfer was perfected against third parties. 11 U.S.C. §§ 101(48), 547(e), 548(d)(1). State law may control the question of whether a debtor has a legal or equitable interest in property that becomes property of the estate. 11 U.S.C. § 541(a)(1).

When Congress specifically provides for recognition of state laws by a court of the United States sitting within a state such state laws are "laws *for* the United States" (perhaps as distinguished from laws *of* the United States), even though such laws may vary considerably from state to state. *Fink v. O'Neil*, 106 U.S. (16 Otto) 272, 276, 1 S.Ct. 325, 27 L.Ed. 196 (1882); *United States v. Bess*, 357 U.S. 51, 57, 78 S.Ct. 1054, 1058, 2 L.Ed.2d 1135 (1958). The federal court is directed to adopt the state law as the federal rule of decision. In deciding a controversy the court must necessarily interpret and apply state law. Thus state law is incorporated in a sense as federal law but the rights of the parties are created by state law and arise under state law rather than under federal law, because absent a state law right there is no federal law right.

The problem with Mr. Kastenmeier's thesis that state law rights arising in bankruptcy proceedings are functionally equivalent to congressionally-created rights is that state law rights do not in fact arise in bankruptcy proceedings merely because after the intervention of bankruptcy such rights are enforceable only to an extent permitted by bankruptcy law. State law rights ordinarily arise before bankruptcy, are enforceable in the state courts prior to the intervention of bankruptcy and may remain enforceable thereafter if the debtor is denied a discharge, the case is dismissed, or to the extent the claim of a creditor is a secured claim.

In the view of this court state-created rights recognized under bankruptcy law are not functionally equivalent to congressionally-created rights. In footnote 26 to the plurality opinion in the *Northern Pipeline* case, speaking of the action by the estate of the debtor Northern Pipeline Construction Company against Marathon Pipe Line Company, the Court said:

> This claim may be adjudicated in federal court on the basis of its relationship to the petition for reorganization.... But this relationship does not transform the state created right into a matter between the Government and the petitioner for reorganization. Even in the absence of the federal scheme, the plaintiff would be able to proceed against the defendant on the state-law contractual claims.

458 U.S. 50, 72 n. 26, 102 S.Ct. 2858, 2872 n. 26.

The same is equally true with respect to claims by creditors against a debtor's estate. The fact that a claim must be timely asserted in the bankruptcy case and if asserted may be adjudicated in the federal bankruptcy court does not transform the state-created right on which the claim is based into a matter between the Government and the debtor. In the absence of bankruptcy the creditor would be able to proceed against the debtor on any state law contractual claim.

In any event the bootstrapping of state-created rights to functional equivalency with congressionally-created rights does not help us through the constitutional maze laid down by *Northern Pipeline.* As we have already seen, the courts, including the Supreme Court, have rejected the notion that non-Article III judges may finally adjudicate all rights and duties, particularly disputes between private parties, arising under otherwise valid laws of the United States, without the consent of the parties and subject only to traditional appellate review.

If Mr. Kastenmeier were correct in his belief that all such adjudications may be made by non-Article III judges, there is a relatively simple solution to the problem of conferring pervasive jurisdiction on a non-Article III bankruptcy court. All Congress need do is provide in rather straightforward statutory language that all rights of action that pass to a debtor's estate as well as all rights of action against a debtor's estate shall be deemed to arise under title 11. If prepetition claims or causes of action of creditors against the debtor's estate arise in a case under title 11, merely because an objection to the claim is a proceeding under title 11, as the drafters of the Kastenmeier Amendment seem to presume, then why do not prepetition causes of action by the estate against third parties likewise arise in the case when an adversary proceeding is filed in the case in pursuance of the cause of action. If we can create a legal fiction that prepetition claims against a debtor arise in the bankruptcy case most certainly we can create a legal fiction that prepetition claims of the debtor against third parties also arise in the case.

Mr. Kastenmeier next asserts that claims of creditors, that would otherwise be a matter of state law, change their character when tried as part of the core bankruptcy function of restructuring debtor-creditor rights; that what would ordinarily be an action at law is transformed into an equitable proceeding when it arises in a core bankruptcy proceeding.

In support of this proposition Mr. Kastenmeier relies on the following language from the opinion of the Supreme Court in

*Katchen v. Landy,* 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966).

> [A]lthough petitioner might be entitled to a jury trial on the issue of preference if he presented no claim in the bankruptcy proceeding and awaited a federal plenary action by the trustee, ... when the same issue arises as part of the process of allowance and disallowance of claims, it is triable in equity. The Bankruptcy Act, passed pursuant to the power given to Congress by Art. I., § 8, of the Constitution to establish uniform laws on the subject of bankruptcy, converts the creditor's legal claim into an equitable claim to a pro rata share of the res. ... *Id.,* at 336 [86 S.Ct. at 476] (citation omitted).

130 Cong. Rec. E1110, col. 1 (daily ed. Mar. 20, 1984).

It does not follow from the fact that a claim against the estate is triable in equity without a jury that it is triable by a non-Article III judge. The Supreme Court addressed this issue squarely in footnotes 31 and 23 to the plurality opinion in the *Northern Pipeline* case as follows:

> In *Katchen v. Landy,* 382 U.S. 323 [86 S.Ct. 467, 15 L.Ed.2d 391] (1966), on which the dissent relies, there was no discussion of the Art. III issue. Moreover, when *Katchen* was decided the 1973 Bankruptcy Rules had not yet been adopted, and the District Judge, after hearing the report of magistrate, was free to "modify it or ... reject it in whole or in part or ... receive further evidence or ... recommit it with instructions." Gen. Order in Bankruptcy No. 47, 305 U.S. 679 (1935).

458 U.S. 50, 79 n. 31, 102 S.Ct. 2858, 2876 n. 31.

> Congress cannot "withdraw from [Art. III] judicial cognizance *any* matter which, *from its nature,* is the subject of a suit at common law, or in equity or admiralty." *Murray's Lessee v. Hoboken Land & Improvement Co.,* 18 How. 272, 284, 15 L.Ed. 372 (1856) (emphasis added)....

458 U.S. 50, 69 n. 23, 102 S.Ct. 2858, 2870–2871 n. 23.

If Congress cannot withdraw from Article III judicial cognizance any matter which from its nature is the subject of a suit at common law or in equity, the fact that what would ordinarily be an action at law is transformed into an equitable proceeding when it arises in a core bankruptcy proceeding leads to another dead end in the Article III maze.

None of the grounds enunciated by Mr. Kastenmeier in his extension of remarks tend to support the constitutionality of the jurisdictional provisions of his amendment.

The debtor-creditor relationship which is adjusted in bankruptcy proceedings ordinarily is created by transactions between a debtor and such debtor's creditors prior to bankruptcy. With minor exceptions, as for example a claim for federal taxes, the rights of the parties are fixed prior to bankruptcy under state law by contracts, deeds, leases, notes, mortgages, security agreements or state statutes. Generally, a creditor's claim must exist prior to or on the date of the order for relief. 11 U.S.C. § 101(4), (9)(A), 11 U.S.C. § 502(b). A claim is allowed as filed unless objected to by a party in interest. 11 U.S.C. § 502(a). The principal basis for objecting to a claim is that such claim is unenforceable under the agreement on which the claim is based or under applicable law, which most often will be state law. 11 U.S.C. § 502(b)(1). The extent to which contingent or unmatured claims shall be allowed is to be determined by the bankruptcy court applying state law. In determining an objection to a claim or in hearing evidence to fix the allowed amount of a contingent or unmatured claim the bankruptcy judge in a sense sits as a state trial court judge in the same manner as a district judge does in a diversity of citizenship case.

When bankruptcy intervenes the automatic stay provided for by 11 U.S.C. § 362(a) precludes creditors from pursuing claims against the debtor in another forum. As a tradeoff therefor creditors are provided a new forum, the bankruptcy court, in which to have their rights adjudicated, but the rights to be adjudicated exist under

state law and are not rights created by Congress any more so than a claim asserted in a diversity of citizenship case is a right created by Congress merely because Congress has provided an alternative forum in which the right may be vindicated. Moreover creditors holding unsecured claims must timely file such claims in a chapter 7 or chapter 13 case or forego the claims entirely. They are coerced into asserting state-created claims and causes of action in the bankruptcy court.

One may experience considerable difficulty in convincing a creditor, who as a result of a debtor's bankruptcy is restricted to asserting a claim in the bankruptcy court against the debtor's woefully inadequate estate and who has been informed that the debtor may be discharged from personal liability for any balance due thereon, that in presenting a proof of claim the creditor is asserting a right created by Congress. From the creditor's point of view the creditor is the victim of restrictions imposed by Congress on such creditor's rights under state law rather than the beneficiary of any rights created by Congress.

Moreover, such creditor's rights may be further restricted by the fact that Congress in its wisdom has granted a priority in distribution to other creditors, such as federal, state and local taxing entities, as a result of which the creditor may receive nothing on its claim. Such a creditor may well ask what right has Congress created in its behalf that warrants restricting it to asserting its prebankruptcy state law claim in a particularized non-Article III bankruptcy forum.

Likewise, it is difficult to conceptualize how a secured creditor, who is estopped by the intervention of bankruptcy from foreclosing its lien on collateral in possession of a debtor, is ultimately accorded any right created by Congress. The bankruptcy law enacted by Congress imposes an automatic stay against lien enforcement by such creditor and then specifies a procedure for obtaining relief therefrom, but the underlying right of the creditor to foreclose on its security is a right created by state law that existed prior to bankruptcy and that survives bankruptcy. Again, Congress has restricted rather than created a right in favor of such creditor.

The foregoing "rights" accorded creditors, the right to be forever enjoined from collecting on a claim otherwise valid under state law and the right to be precluded from foreclosing on collateral pursuant to a lien otherwise valid and enforceable under state law, if such are indeed "rights," are surely not the kinds of rights the Supreme Court had in mind when it noted that when Congress creates a statutory right it may provide that persons seeking to vindicate that right must do so before particularized tribunals created to perform the specialized adjudicative tasks related to that right. More than likely the Court had in mind social security, black lung, pension or veterans benefits, the issuance of certificates of convenience and necessity to truck lines, or radio or television station licenses or the like, the granting of which is discretionary by the sovereign in the first instance.

From the point of view of a debtor who seeks relief under the Bankruptcy Code, an individual debtor may obtain a discharge in bankruptcy in a chapter 7 liquidation case, an extension or composition of debts or both in a chapter 11 or chapter 13 case and a corporate or partnership entity may obtain an extension or composition of debts or both in a chapter 11 reorganization case.

A discharge in bankruptcy is both an injunction and an affirmative defense against collection efforts by creditors. It makes permanent the stay against efforts by creditors to collect claims as liabilities of an individual debtor to the extent that claims are released by the discharge and provides the debtor with an affirmative defense against such claims. The protection afforded the debtor by the discharge in bankruptcy restricts creditors to asserting claims against the debtor's estate, except with respect to any claims that may survive bankruptcy.

In the plurality opinion in the *Northern Pipeline* case the Supreme Court ad-

dressed but did not resolve the question of whether a discharge in bankruptcy is a public right. The Court said:

> Finally, the substantive legal rights at issue in the present action cannot be deemed "public rights." Appellants argue that a discharge in bankruptcy is indeed a "public right," similar to such congressionally created benefits as "radio station licenses, pilots licenses, and certificates of common carriers" granted by administrative agencies. See Brief for United States 34. But the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the ajudication of state created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a "public right," but the latter obviously is not.· Appellant Northern's right to recover contract damages to augment its estate is "one of private right, that is, of liability of one individual to another under law as defined." *Crowell v. Benson,* 285 U.S., at 51 [52 S.Ct., at 292].

458 U.S. 50, 71–72, 102 S.Ct. 2858, 2871–2872.

Of course, a claim by a creditor against a debtor or a debtor's estate based on contract or to recover contract damages is also one of private right, that is, of the liability of one individual to another under law as defined.

In his concurring opinion in the *Thomas* case, Justice Brennan again suggests that "a *bankruptcy adjudication* (apparently meaning a discharge in bankruptcy), though technically a dispute between private parties, may well be characterized as a matter of public rights." *Thomas v. Union Carbide Agric. Products Co.,* 473 U.S. 568, ——, 105 S.Ct. 3325, 3339–3340, 3343, 87 L.Ed.2d 409, 428, 432 (1985) (Emphasis supplied). Unfortunately we are provided no insight as to the kinds of matters the Court may envision as falling within the scope of a "bankruptcy adjudication."

To those of us in the trade a "bankruptcy adjudication" is a no longer used perjorative phrase that referred to the initial event in a bankruptcy case, in other words to the order for relief that occurs by operation of law when a debtor files a voluntary petition or to the order for relief that may be entered by the court on an involuntary petition. 11 U.S.C. §§ 301, 302(a), 303(h); H.R.Rep. No. 595, 95th Cong., 1st Sess. 321 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 31 (1978), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5817, 6277. An order for relief is entered on the petition whether or not the debtor subsequently receives a discharge in bankruptcy or obtains confirmation of a plan. The problem is one of defining the extent to which a non-Article III bankruptcy judge may be delegated not only the power to grant or deny a discharge in bankruptcy or to confirm a plan but also, as an incidence thereof, the power to adjudicate the multiplicity of "follow-on," state-law based controversies that arise between private parties (the debtor, the trustee, third parties holding property of or obligated to the estate, creditors holding claims against the estate) in the process of the administration of the case.

Obviously, a non-Article III bankruptcy court system designed around the concept of a discharge in bankruptcy as a public right would necessarily be a very limited, inconsequential and ineffective system.

Congress in its discretion may provide that a debtor seeking relief under the Bankruptcy Code *may or may not* be granted a discharge in bankruptcy. In fact, Congress has done so by present law by providing that only individual debtors may receive a discharge in a chapter 7 case and by excepting certain debts from discharge. Corporations and partnerships no longer receive a discharge in bankruptcy. 11 U.S.C. § 727(a)(1).

If a discharge in bankruptcy is indeed a "public right" Congress has conferred no such right on corporations and partnerships seeking relief in a chapter 7 case. When a petition for relief under chapter 7 of the Bankruptcy Code is filed in behalf of

a corporation or a partnership entity there is no "public rights" peg on which to rely in delegating to a non-Article III court jurisdiction for administration of the case, because such entities do not receive a discharge. Their assets are liquidated and distributed to creditors according to the priorities provided for by the Bankruptcy Code. Any balance due on the claim of a creditor against such an entity survives the proceeding and may be pursued against the corporate or partnership shell in any appropriate nonbankruptcy forum.

With respect to individual debtors, if the discharge in bankruptcy is a public right, an administrative agency or non-Article III court might determine whether to sustain or overrule objections to discharge of the debtor or to the dischargeability of particular debts, that is, whether the discharge in bankruptcy shall be available to the debtor as an injunction and as a defense. But may such agency consistent with Article III of the Constitution proceed beyond that point and adjudicate a dispute as to the amount of any particular debt claimed to be nondischargeable and render judgment therefor? In other words, may such an agency determine a private right, the liability of one individual to another under law, which is a matter between debtor and creditor rather than a matter between the debtor and the Government?

By way of analogy suppose a radio or TV station has applied for renewal of its license and a third party objects to renewal on the grounds the entity that operates the station is irresponsible, has slandered the objector and in connection with the objection demands judgment against the station for actual and punitive damages for slander. May an administrative agency as part of the process of deciding whether the entity owning the station should or should not have its license renewed be permitted to decide the merits of the objector's state-law based tort claim against the station and render judgment thereon?

Suppose that while practicing aerobatics a pilot is forced to land in a pasture and in the process of landing kills a farmer's prize bull. The farmer intervenes in a proceeding to revoke the pilot's license and demands judgment for the value of the bull. May the administrator as part of the process of deciding whether to revoke the pilot's license be authorized to determine the liability of the pilot to the farmer on the farmer's state-law based claim for the death of the bull.

Suppose doctors and hospitals that are creditors of an applicant for Black Lung benefits should be permitted to intervene in the proceedings on the application and demand payment for their services from the proceeds of any award made to the applicant. Suppose further that the applicant asserts a counterclaim for medical malpractice against one of the physicians demanding payment. May an administrative agency be empowered to determine the validity and amount of these claims of third parties and the applicant's counterclaim for medical malpractice against one of his former physicians incident to determining the applicant's eligibility for Black Lung benefits.

One might suggest that the extension of the jurisdiction of administrators who pass on applications for radio or TV station broadcasting licenses or pilots licenses or who adjudicate Black Lung claims to include pendent jurisdiction over state-law based claims of third parties against the applicants as well as counterclaims of the applicants against such third parties surely would be an unwarranted and perhaps unconstitutional extension of the "public rights" doctrine. Why so? The property right or property under administration in such a proceeding is solely that of the sovereign, whereas the property under administration in a bankruptcy case is that of the private person who seeks relief under the Bankruptcy Code. There would appear to be far more justification for the exercise of pendent jurisdiction over state-law based controversies between the applicant and third parties in the former instance than in the latter.

Actually, no one, not even Congressman Kastenmeier, has taken seriously the suggestion that because a discharge in bank-

ruptcy may be a public right, a non-Article III bankruptcy court empowered to grant or deny such right may incident thereto adjudicate all state-law based controversies between private parties that arise during the course of administration of the estate and render final judgment with respect thereto.[10] If such were permissible it would open a Pandora's box of usage of this doctrine by Congress to confer on administrative agencies jurisdiction to adjudicate a variety of private rights incident to determination of a public right. The inroads this would permit into functions that traditionally have been performed by the Judiciary are apparent.

A bankruptcy proceeding operates as a collective execution in behalf of creditors on all the assets of the debtor, whether such assets are in the possession of the debtor or are in the possession of third parties. Unliquidated and contingent claims of the debtor against third parties are assets of the debtor's estate which may be collected and administered by the trustee. If, as decided by the Supreme Court in the *Northern Pipeline* case, it is unconstitutional to coerce obligors of the debtor into the bankruptcy milieu unless the claims of the debtor's estate against them are adjudicated by an Article III court, why is it not likewise unconstitutional to coerce claimants against the debtor's estate into the bankruptcy arena unless their claims against the estate are adjudicated by an Article III court? The Supreme Court did not decide the latter question in the *Northern Pipeline* case because the issue was not presented by the facts of that case. An inference that the latter procedure is constitutionally permissible even though the former is not is simply unwarranted.

The drafters of the Kastenmeier Amendment somehow convinced the Congress that *core judicial power,* which in our federal system historically may be exercised only by Article III judges in the adjudication of private rights,[11] may be subordinated constitutionally to *core bankruptcy power* and disregarded when private rights are adjudicated in an action known as a core bankruptcy proceeding. Perhaps this core-may-eat-core theory of constitutional law was so readily accepted by Congress because we are all enamored of computer games in which it is permissible for a charismatic, electronically-created creature to gobble up every other creature that crosses its path and moreover score points by doing so. Why not introduce such an enigmatic, animated creature into the field of bankruptcy law in the form of a core bankruptcy proceeding and let it feed on private rights. We might denominate this Pacman constitutional law.

And once we have introduced this concept as a means of expanding the jurisdictional powers of a non-Article III bankruptcy court, as the inventors of a new game, why restrict our imagination in identifying the parameters of core bankruptcy proceedings. If we were to define the core of an apple to include all of the fruit except the peel, or the core of the earth to include all terrain except the very tip of Mount McKinley, our definitions might be suspect. But since we are inventing a new game that involves impacting private rights into core bankruptcy proceedings with about the same finesse that a garbage truck impacts our private papers into impenetrable blocks, why not, as is done by the Kastenmeier Amendment, define core bankruptcy proceedings to include every conceivable

**10.** In his Extension of Remarks Congressman Kastenmeier says—

It's not important that bankruptcy proceedings do not involve "public rights." Jurisdiction must be confined to public rights only where Congress attempts to create a separate Article I court. My amendment establishes bankruptcy judges as adjuncts to the district court.
130 Cong.Rec. E1109, col. 2 (daily ed. Mar. 20, 1984). Mr. Kastenmeier cites no authority for the statement that jurisdiction must be confined to public rights only where Congress attempts to create a separate Article I court.

**11.** "Private-rights disputes ... lie at the core of historically recognized judicial power." *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 70, 102 S.Ct. 2858, 2871, 73 L.Ed.2d 598 (1984).

type of proceeding, even those with respect to which state law provides the rule of decision, with the single exception of the type of proceeding that was involved in the *Northern Pipeline* case. In this manner it will appear that homage is being paid to the decision of the Supreme Court in the *Northern Pipeline* case and to Article III of the Constitution when all the while those playing the game are thumbing their noses at both.

When the concept of core proceedings becomes entrenched and accepted in the field of bankruptcy law it can then be introduced by Congress into other 'fields of law as a means of withdrawing matters from consideration by the Article III courts. For example, if the core bankruptcy power is expansive enough to permit adjudication of private rights for which state law provides the rule of decision by non-Article III judges in the exercise of the bankruptcy power, why would not the adjudication of private rights by non-Article III judges be permissible in connection with the exercise of other core powers of Congress, as for example the power to regulate commerce among the several states or to lay and collect taxes or to secure exclusive rights to writings and discoveries. U.S. Const. art. I, § 8.

For example, the Fair Debt Collection Act, Fair Credit Reporting Act and Truth in Lending laws are all enacted by Congress in the exercise of its power to regulate commerce among the several states. We have rejected the assumption that an action by a debtor against a lender or other private party to vindicate a right or to recover damages under such laws can be finally adjudicated by a non-Article III judge merely on the basis that the action arises wholly under federal law. Can we nevertheless arrive at the conclusion that final adjudication of such disputes by a non-Article III judge is permissible in connection with the exercise by such judge of the core commerce power of the sovereign

as the Kastenmeier Amendment hypothesizes is permissible in the bankruptcy context in connection with the exercise of the core bankruptcy power of the sovereign.[12]

We must not overlook the fact that in the *Northern Pipeline* case the plurality opinion considered the relationship between core judicial power and core federal bankruptcy power and held that the former cannot be usurped by the latter in the manner proposed by Mr. Kastenmeier. We quote:

> The distinction between public rights and private rights has not been definitively explained in our precedents. Nor is it necessary to do so in the present case, for it suffices to observe that a matter of public rights must as a minimum arise "between the government and others." *Ex Parte Bakelite Corp.*, supra, [279 U.S. 438] at 451 [49 S.Ct. 411, 413, 73 L.Ed. 789 (1929)]. In contrast, "the liability of one individual to another under the law as defined," *Crowell v. Benson*, 285 U.S., at 51 [52 S.Ct. at 292], is a matter of private rights. Our precedents clearly establish that only controversies in the former category may be removed from Art. III courts and delegated to legislative courts or administrative agencies for their determination. See *Atlas Roofing Co. v. Occupational Safety Comm'n*, 430 U.S. [442], at 450, n. 7 [97 S.Ct. 1261, 1266, n. 7, 51 L.Ed.2d 464 (1977)]; *Crowell v. Benson*, supra [285 U.S.], at 50–51 [52 S.Ct., at 292]. See also Katz, Federal Legislative Courts, 43 Harv.L.Rev. 894, 917–918 (1930). Private-rights disputes, on the other hand, lie at the core of the historically recognized judicial power.

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 70, 102 S.Ct. 2858, 2871, 73 L.Ed.2d 598 (1982).

Simply put, the Supreme Court has rejected the Pacman theory of constitutional

---

**12.** May Congress pursuant to its core power to lay and collect taxes authorize a non-Article III judge to adjudicate the priority of liens as between the Government and others in a taxpayer's property encumbered by a federal tax lien? See *NTL Computer Services Corporation v. Capitol Computer Systems, et al.*, 755 F.2d 1253 (6th Cir.1985), discussed *infra*.

law on which the Kastenmeier Amendment is based.

### III. Analysis of the Arguments of the Department of Justice

It is interesting to note that in its brief filed in the *Lawson* case in support of the constitutionality of the jurisdictional provisions of the Kastenmeier Amendment the Department of Justice for the most part eschews the views of Mr. Kastenmeier in his extension of remarks.

The Government argues the bankruptcy court system established by the 1984 Act is constitutionally indistinguishable from the system in effect under the so-called Emergency Resolution or Model Rule which it asserts has been upheld repeatedly as consistent with Article III. Alternatively, the Government argues that the adjudication by adjuncts of traditional bankruptcy matters under the 1984 Act accords with Article III. In support of the latter argument the Government posits that several characteristics of the 1984 Act combine to satisfy Article III requirements. These are: (1) the unfettered control over bankruptcy cases and bankruptcy judges conferred on Article III judges protects bankruptcy adjudications from encroachments by other branches of Government; (2) core bankruptcy issues, which necessarily embrace the adjudication of congressionally-created statutory rights, are uniquely susceptible to adjudication by an adjunct, and (3) extreme specialization of bankruptcy issues and the need for prompt expert adjudications are limiting characteristics that permit delegation without threat to Article III principles.

### A. The Difference Between the Emergency Resolution or Model Rule and the 1984 Act

The United States argues that the bankruptcy court system established by the 1984 Act is constitutionally indistinguishable from the system in effect under the so-called Emergency Resolution or Model Rule under which the bankruptcy courts functioned from December 25, 1982 until

the President signed the 1984 Act into law on July 10, 1984. In the same breath, however, the United States concedes the foregoing statement is not entirely correct, and that the present bankruptcy court system is in fact distinguishable from the system in effect under the Emergency Resolution. Under the Emergency Resolution all matters, both core and non-core, were subject to *de novo* review, whereas under present law *de novo* review is required only with respect to non-core matters, a difference which the Department of Justice itself predicted might result in the new law being declared unconstitutional. See Exhibit No. 1 to this opinion.

At the time of adoption of the Emergency Resolution or Model Rule the core/non-core proceedings dichotomy had not been introduced into our bankruptcy lexicons. This terminology was not used by the Supreme Court in the *Northern Pipeline* case, nor was it used in the Emergency Resolution.

In the *Northern Pipeline* case the Supreme Court distinguished civil proceedings *related to* cases under title 11 from civil proceedings arising under title 11 or arising in cases under title 11. 458 U.S. 50, 54, 102 S.Ct. 2858, 2862. Both of the latter types of proceedings as well as the former obviously are related to cases under title 11, but the former differs from the latter in that the cause of action existed under state or perhaps federal law prior to bankruptcy and independently of bankruptcy. Under this definition prepetition claims of the debtor against third parties that pass to the estate upon the filing of a petition for relief under the Bankruptcy Code as well as prepetition claims of third parties against the estate are "related to" proceedings because both are causes of action that, in the absence of the filing of a petition for relief under the Bankruptcy Code, could have been brought in a state or U.S. district court.

The Emergency Resolution or Model Rule accepted this premise but attempted to restrict the definition of "related proceedings." The Emergency Resolution de-

fined "related proceedings" in such a manner as to exclude therefrom some civil proceedings by the estate against third parties —i.e., counterclaims by the estate in whatever amount against persons filing claims, orders to turn over property of the estate, which ordinarily would be entered only in a proceeding requesting such a turnover, proceedings to set aside fraudulent and preferential conveyances, which may be grounded on state as well as federal law, and orders approving the sale of property in which the estate has an interest, which may involve liquidation of the interest of co-owners as well as creditors in such property. The Emergency Resolution also defined related proceedings in such a manner as to exclude therefrom allowance of and objection to claims, even though in the absence of bankruptcy the holders of such claims could have brought an action thereon in a state or perhaps in a U.S. district court.

The ultimate result of this definitional legerdemain was that some, but not all, claims by the estate against third parties and all claims by third parties against the estate were excluded from the definition of "related proceedings," even though all clearly involve private adjudications in federal courts.[13]

The rather suspect categorization of proceedings by the Emergency Resolution was rendered less serious by the fact that in all categories of proceedings, related as well as other proceedings, the orders of the bankruptcy judge were subject to *de novo* review by the district court. Under the Emergency Resolution, in reviewing a bankruptcy court order, in either a related or other proceeding, the district judge was empowered to hold a hearing and receive additional evidence. The Emergency Resolution provided that in conducting such a review the district court need give no def-

erence to the findings of the bankruptcy judge. Emergency Resolution (E)(2)(b).

Under the 1984 Act those matters other than related proceedings are now identified as core proceedings and those that were "related proceedings" are now called noncore proceedings.

As previously noted, the significant difference between the Emergency Resolution and the new Act is that under the new Act the orders of the bankruptcy judge in core proceedings are no longer subject to *de novo* review by the district court.

Because of this fact the argument of the United States that the bankruptcy court system under the new Act is constitutionally indistinguishable from the system in effect under the Emergency Resolution is obviously incorrect. Also, the phalanx of cases upholding the validity of the Emergency Resolution offers little guidance for the resolution of the present case.

As a matter of fact, prior to passage of the 1984 Act the Department of Justice suggested an amendment that would have made all decisions of the bankruptcy court subject to *de novo* review. The Department expressed the view that unless such an amendment were adopted the new law might be unconstitutional. The amendment was not adopted. See Exhibit No. 1 to this opinion.

Having had its amendment rejected by Congress, the Department seeks to achieve the result that would have been achieved by the amendment by urging upon the court an aberrant interpretation of the 1984 Act. The Department argues there are no temporal limitations on the power of the district court to withdraw any proceeding even after the decision of the bankruptcy judge has become final by reason of the failure of a party affected by the decision to appeal. The Department argues that—

---

**13.** In footnote 25 to the plurality opinion in the *Northern Pipeline* case the Court suggested:

> What clearly remains subject to Art. III are all private adjudications in federal courts within the state—matters from their nature subject to "a suit at common law or in equity or admiralty"—and all criminal matters, with the nar-

> row exception of military crimes. There is no doubt that when the framers assigned the "judicial power" to an independent Art. III branch, these matters lay at what they perceived to be the protected *core* of that power. (Emphasis supplied).

458 U.S. 50, 70, 102 S.Ct. 2858, 2871.

In reviewing a bankruptcy judge's decision, the district court would have the option to either review the bankruptcy court's decision as if it were an appellate court or, in its discretion, withdraw the reference. After withdrawal, the district court of course could exercise complete authority over the case or proceeding. In short, functionally the district court has discretion as to what standard of review it will accord decisions of a bankruptcy judge. This discretion is precisely the same as that conferred on the district court by the reference rule. Model Rule § (e)(2)(b).

Brief of the Department of Justice at 18–19, *In re Lawson*, 42 B.R. 206 (Bankr.E.D. Ky.1984).

This argument was initially accepted but was subsequently rejected by the United States District Court for the Central District of California in *In re Tom Carter Enterprises, Inc.* See original opinion dated Dec. 5, 1984, Bk. Case No. SA 83–05401RP, Adv.Case No. SA 84–0624RP; See Second Amended Memorandum and Order dated Feb. 20, 1985. The published opinion conforms to the Second Amended Memorandum of the court which rejects this argument of the Department of Justice. 44 B.R. 605, 12 B.C.D. 536, 11 C.B. C.2d 1216 (D.C.Cal.1984). The court apparently was persuaded that withdrawal of a reference after a bankruptcy judge's final decision would create serious problems for the operation of the bankruptcy system because trustees or debtors would not be able to sell assets or borrow money or enter into other transactions with any degree of certainty based on an order of a bankruptcy judge. See Bankruptcy Service, Current Awareness Alert, Issue No. 5, August 1985, at 75, 81.

In any event the construction of the statute to permit withdrawal of a reference even after a final decision has been rendered by the bankruptcy judge in a core proceeding is contrary to the interpretation which Mr. Kastenmeier himself placed on his amendment.

My amendment authorizes bankruptcy judges to decide all core bankruptcy proceedings, subject only to traditional appellate review....

Extension of Remarks by Congressman Kastenmeier, 130 Cong.Rec. E1108, col. 3 (daily ed. Mar. 20, 1984).

Nor is it important that the district court does not review *de novo* the bankruptcy judge's findings in core bankruptcy proceedings. Marathon stated that *de novo* review was necessary only in suits arising under state law and that Congress could assign broader powers to an adjunct in the adjudication of Federal statutory proceedings.[14]

Extension of Remarks by Congressman Kastenmeier, 130 Cong.Rec. E1109, col. 2 (daily ed. Mar. 20, 1984).

It will be noted that 28 U.S.C. § 157(b)(1) authorizes the bankruptcy judge to "hear and determine" core proceedings, whereas 28 U.S.C. § 157(c) merely authorizes the bankruptcy judge to "hear" and submit proposed findings in a proceeding that is not a core proceeding, unless all parties consent to a reference that permits the bankruptcy judge to "hear and determine" a non-core proceeding. Any matter which a bankruptcy judge may "hear and determine" is subject to review under 28 U.S.C. § 158. This latter section confers on the district court jurisdiction to hear appeals from "final judgments, orders, and decrees" of bankruptcy judges, if a notice of appeal is timely filed as provided by Bankruptcy Rule 8002. Such an appeal is to be taken in the same manner as appeals in civil proceedings generally to the courts of appeals from the district courts. 28 U.S.C. § 158(a) and (c). *Icicle Seafoods, Inc. v. Worthington*, — U.S. —, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986). There is little doubt that Congress intended to restrict the district court to application of a "clearly erroneous" standard in reviewing the

---

**14.** We do not imply that Mr. Kastenmeier's suggestion that Congress may completely preclude judicial review of the factual findings of an adjunct in a federal statutory proceeding is a correct statement of the law.

findings of fact of a bankruptcy judge in such an appeal.

Even in cases and proceedings under the Bankruptcy Act where jurisdiction exercised by the bankruptcy judge was "subject *always* to review by the [district] judge" [emphasis added], the rule of law was that absent timely appeal the decision of the bankruptcy judge had the force and effect of an order of the district court, was *res judicata* as to the merits, and was not subject to collateral attack in the district court. Bankr. Act §§ 38, 39(c), 11 U.S.C. §§ 66, 67(c), as amended by Act of July 14, 1960, 74 Stat. 528; 2A *Collier on Bankruptcy* ¶ 39.29 (14th ed.); 8 *Remington on Bankruptcy* § 3406 (6th ed.), cummulative supplement; *In re Highley,* 459 F.2d 554 (9th Cir.1972); *In re General Insecticide Co.,* 403 F.2d 629 (2d Cir.1968); *In re Imperial "400" Nat. Inc.,* 391 F.2d 163 (3rd Cir.1968); *In re Acme Furnace Fitting Co.,* 302 F.2d 318 (7th Cir.1962), *cert. denied,* 371 U.S. 853, 83 S.Ct. 89, 9 L.Ed.2d 88, *reh'g denied,* 371 U.S. 906, 83 S.Ct. 209, 9 L.Ed.2d 168; *In re Benefiel,* 354 F.Supp. 205 (D.C.Idaho 1973), *aff'd,* 500 F.2d 1219 (9th Cir.1974); *In re Virgin Island Paper Co.,* 353 F.Supp. 11 (D.C.V.I.1973), *aff'd without op.,* 491 F.2d 748 (3rd Cir.), and *aff'd without op.,* 491 F.2d 752 (3rd Cir. 1973); *In re Lewis Jones, Inc.,* 369 F.Supp. 111, 117–18 (E.D.Pa.1973).

## B. The Standard of Review

Apparently recognizing that its argument that the district court may withdraw any proceeding even after the decision of the bankruptcy judge has become final is contrary to the plain language of the statute, the Department of Justice next argues that review of the decision of the bankruptcy judge in core proceedings under a clearly erroneous standard is not inconsistent with Article III.

In support of this proposition the Department cites *In re Morrissey,* 717 F.2d 100 (3rd Cir.1983); *1616 Reminc Ltd. Partnership v. Atchison & Keller,* 704 F.2d 1313 (4th Cir.1983); *Montana Power Co. v. Environmental Protection Agency,* 608 F.2d 334 (9th Cir.1979); *General Committee of Adjustment v. Missouri-Kansas-Texas Railroad Co.,* 320 U.S. 323, 336, 64 S.Ct. 146, 152, 88 L.Ed. 76 (1943); and Rule 53(e)(2) of the Federal Rules of Civil Procedure. None of these citations support the argument of the Department of Justice.

In *In re Morrissey,* the court was confronted with a conflict between provisions of the so-called Emergency Resolution or Model Rule and subsequently adopted Bankruptcy Rules governing appeals.

After promulgation of the Emergency Resolution or Model Rule by the Judicial Conference of the United States in December, 1982, and adoption of the rule by the district courts pursuant to orders of the circuit councils, directing the district courts to adopt the rule as a local rule, the Supreme Court on April 25, 1983 transmitted to Congress new Bankruptcy Rules in accordance with 28 U.S.C. § 2075. Congress added a subsection (f) to Rule 2002 (Pub.L. No. 98–91 (1983)), but otherwise left the rules unchanged. These rules took effect August 1, 1983.

New Bankruptcy Rule 8013 conflicted with section (E)(2)(b) of the Emergency Resolution or Model Rule. The new rule provided that on appeal to the district court the findings of fact of the bankruptcy court shall not be set aside unless clearly erroneous, whereas the Emergency Resolution or Model Rule provided that in conducting a review of a bankruptcy judge's decision the district judge need give no deference to the findings of the bankruptcy judge. *Morrissey* held that the "clearly erroneous" standard for appellate review set forth in Bankruptcy Rule 8013 superceded the *de novo* standard adopted by the Emergency Resolution or Model Rule because neither the Judicial Conference nor the several district courts have authority to propose and enact local rules that conflict with the new bankruptcy rules. 28 U.S.C. §§ 2071, 2075. The court recognized that the constitutionality of the new rule had been called into question in *1616 Reminc Ltd. Partnership v. Atchison & Keller,* 704 F.2d 1313 (4th Cir.1983), but that issue was not before the

court. The statement in the brief of the Department of Justice that the "Third Circuit directed application of the clearly erroneous standard on remand without a hint of a constitutional problem" is simply incorrect. See *In re Morrissey*, 717 F.2d 100, 104 n. 7 (3rd Cir.1983).

*1616 Reminc Ltd. Partnership v. Atchison & Keller* did not, as represented by the Department of Justice in its brief, involve a cause of action "that would be a non-core matter under the 1984 Act." Under 28 U.S.C. § 157(b)(2)(C), a counterclaim by a debtor against a creditor who has filed a claim, which was the factual situation involved in *Reminc*, is defined as a core proceeding.[15] The statute makes no distinction between a permissive and a compulsory counterclaim.

Reminc's principal asset was an office building in which Atchison & Keller, as subcontractor of the prime contractor, had installed the heating and air conditioning system, which failed to work as planned, as a result of which Reminc lost tenants and sought protection in a real property arrangement proceeding under Chapter XII of the Bankruptcy Act.

Atchison & Keller filed a proof of claim based upon a mechanic's lien under Virginia law against the office building. Reminc objected to the claim and filed a compulsory counterclaim against Atchison & Keller, its principals, and its surety Peerless Insurance Company, for breach of contract seeking to hold them liable on the theories of express warranty under Virginia common law as well as under the warranty provisions of the Virginia Commercial Code.

The bankruptcy judge ruled against the debtor in possession, Reminc, on its counterclaim, holding that the malfunctioning of the heating and air conditioning system was due to misplacement or misconstruction of an airshaft by another subcontractor. The district court affirmed, deferring

under the clearly erroneous standard found in Rule 810 of the Rules of Bankruptcy Procedure to the factual determinations of the bankruptcy judge, in view of the conflict in the evidence. The district court's opinion was issued February 17, 1982, which was subsequent to the April 23, 1981 decision of the Minnesota district court in the *Northern Pipeline* case, but prior to the June 28, 1982 decision of the Supreme Court.[16]

On appeal to the Fourth Circuit, Reminc argued that application of Rule 810, which is the predecessor of and is identical to present Rule 8013, resulted in its counterclaim being fully adjudicated by a nontenured bankruptcy judge, subject only to traditional appellate review, in violation of Article III of the Constitution.

The Fourth Circuit concluded that the application of Rule 810 unconstitutionally vested in the non-Article III bankruptcy judge too great a measure of the judicial power of the United States; that in conducting a full trial covering all aspects of Reminc's contract claim, the bankruptcy judge was more than an "adjunct" of the district court. The court observed that neither *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), nor *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980), endorsed the extent of control over Reminc's contract action effectively vested in the bankruptcy court by Rule 810; that Reminc's contract action claim is not included among the many matters over which Congress possesses well-established power to commit to the authority of administrative agencies or legislative courts.

Because the "clearly erroneous" standard governs appeals from the decision of bankruptcy judges in all core matters, including counterclaims grounded in state law against a creditor who files a claim, it

---

**15.** Reminc's counterclaim was against the claimant, but the complaint was for relief against non-claimant parties as well. Apparently none of these parties contested the jurisdiction of the bankruptcy court.

**16.** *Marathon Pipeline Co. v. Northern Pipeline Construction Co.*, 12 B.R. 946 (D.C.Minn.1981); *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

would appear that 28 U.S.C. §§ 157 and 158 are definitely unconstitutional under the decision of the Fourth Circuit in *Reminc.*

In *Montana Power Co. v. Environmental Protection Agency,* 608 F.2d 334 (9th Cir.1979), an electric utility sought to establish that it had commenced construction of two coal-fired electric generating plants before a grandfathering cutoff date in order that it might avoid additional expensive pollution control efforts required by EPA regulations promulgated under the Clean Air Act, as amended, 42 U.S.C. § 7401, *et seq.* The case concerns a public right, a permit to construct and operate an electric generating plant. EPA found the utility was not exempt under the grandfather clause from further preconstruction review and permitting procedures intended to prevent significant deterioration of air quality. The case turned on the appropriate standard of review of agency action under the Administrative Procedures Act, 5 U.S.C. § 706(2), which permits a reviewing court to set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The case is not apposite because, unlike 28 U.S.C. §§ 157, 158, title 5, United States Code, § 706(2) does not preclude *de novo* review of facts under all circumstances. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 414–15, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971); *Newsom v. Vanderbilt University,* 653 F.2d 1100, 1107–08 (6th Cir.1981). Also, there is no occasion for the district court to defer to the factual determinations of a bankruptcy judge in a core bankruptcy proceeding with respect to a state law claim or cause of action. It can hardly be contended that a bankruptcy judge has a greater degree of expertise than a district judge in adjudicating state-law based claims and causes of action.

In *General Committee of Adjustment v. Missouri-Kansas-Texas Railroad Co.,* 320 U.S. 323, 64 S.Ct. 146, 88 L.Ed. 76 (1943), the Supreme Court held there was no justiciable issue. Two unions, the Brotherhood of Locomotive Engineers and the Brotherhood of Locomotive Firemen, were ac-knowledged to be the collective bargaining agents of their respective crafts. A jurisdictional dispute arose over which union had the right to fashion an agreement with a railroad for use of firemen as emergency engineers. The firemen and the carriers entered into an agreement based on a resolution of the dispute by the National Mediation Board. The engineers did not participate in the mediation proceedings. Instead they brought an action in the U.S. district court for a declaratory judgment that the agreement between the railroad and the firemen was in violation of the Railway Labor Act. On appeal, the Supreme Court observed that the dispute necessitated a determination of the point where the authority of one craft ends and the other begins or of zones where they have authority, and held that Congress had chosen to leave the solution of such jurisdictional disputes exclusively to the National Mediation Board rather than to the courts. The right of employees to choose a bargaining agent or of a union so chosen to represent employees, both rights recognized under federal law, were not at issue. The case is hardly authority for the view that state-created private rights or that all federally-created rights can be committed exclusively to determination of an agency of the Executive Branch of Government. The Supreme Court rejected such argument in the *Thomas* case, *supra.*

This court finds little support in the aforementioned cases for the statement in the brief of the Department of Justice that "these precedents provide almost conclusive authority to sustain the constitutionality of the system established by the 1984 Act." If anything, the cases dictate an opposite conclusion.

Also, Rule 53(e)(2) of the Federal Rules of Civil Procedure does not preclude *de novo* review of the findings of a master. Under that rule the district court may modify the report of the master or even hear further evidence.

In *Crowell v. Benson,* 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), Congress

had displaced the traditional admiralty negligence action of a seaman against his employer for injuries sustained while performing service upon the navigable waters of the United States by enactment of the Longshoremen's and Harbor Workers Compensation Act. The new workers' compensation system made employers liable for the payment to their employees of prescribed compensation "irrespective of fault as to the cause of the injury." The compensation to which an employee was entitled for temporary or permanent disability, total or partial, according to the statutory classification, was fixed by statute as a prescribed percentage of the employee's average weekly wages. Employers were required to secure the payment of compensation by procuring insurance or by becoming self-insurers. The Supreme Court noted that the Act had two limitations that were fundamental. It dealt exclusively with compensation in respect to disability or death resulting "from an injury occurring upon the navigable waters of the United States" if recovery "through Workmen's Compensation proceedings may not validly be provided by state law," and it applied only when the relation of master and servant existed. Within its sphere the statute was designed to accomplish the same purpose as the Workmen's Compensation laws of the states.

The administration of the Act was given to the United States Compensation Commission which was authorized to establish compensation districts, appoint deputy commissioners, and make regulations.

Seaman Knudsen filed a claim against Benson under the Act. Benson's answer denied, among other things, that the relation of employer and employee existed between him and the claimant. Crowell, a deputy commissioner of the United States Compensation Commission, after an investigation and hearing, found that the claimant was in Benson's employ at the time of the injury and filed an order for compensation.

As permitted by the statute, Benson brought an action in the U.S. district court against Crowell to enjoin enforcement of the compensation order, alleging that the award was contrary to law for the reason that the seaman was not at the time of the injury an employee of Benson. The statute provided that "the deputy commissioner shall have full authority to hear and determine all questions in respect of" a claim, and that the commissioner's order shall become final unless injunction proceedings for suspension or setting aside of the order were timely instituted in the U.S. district court. The district court was empowered to suspend or set aside a compensation order in whole or in part "if not in accordance with law."

The district judge granted Benson a hearing de novo upon the facts and law, expressing the opinion that the Act would be invalid if not construed to permit such a hearing. After a trial de novo the district court determined that Knudsen was not in the employ of Benson at the time of the injury and enjoined enforcement of the order. The decree was affirmed by the court of appeals and the Supreme Court. The Supreme Court held "we are of the opinion that the district court did not err in permitting a trial de novo on the issue of employment." 285 U.S. 22, 65, 52 S.Ct. 285, 298.

The Supreme Court noted that the statute contains no express limitation attempting to preclude the court, in proceedings to set aside an order as not in accordance with law, from making its own examination and determination of facts whenever that is deemed to be necessary to enforce a constitutional right properly asserted.

The Supreme Court further noted that the statute has a limited application, because it is confined to the relation of master and servant, and the method of determining the questions of fact, which arise in the routine of making compensation awards to employees under the Act, is necessary to its effective enforcement. The Act itself, where it applies, establishes the measure of the employer's liability, thus leaving open for determination the questions of fact as to the circumstances, nature, extent and consequences of the injuries sustained.

The Supreme Court held that the findings of the deputy commissioner as to the foregoing facts could be accepted as final, but that in order to comply with the requirements of Article III certain fundamental or jurisdictional facts such as whether the injury occurred upon the navigable waters of the United States and whether the relation of master and servant existed between the parties were subject to *de novo* review by the district court.

Because of the numerous limiting features of the legislation contested in *Crowell* that are not present with respect to controversies arising under the Bankruptcy Code or in bankruptcy cases, *Crowell* offers little guidance as to the scope of decisional authority that may be delegated to bankruptcy judges in so-called core bankruptcy proceedings. Some of the distinguishing features between the legislation involved in *Crowell* and the legislation involved in this case are: (1) In *Crowell* the seaman's traditional admiralty action for damages was displaced by federal legislation that provided for the recovery of damages without regard to fault and further provided a formula for computation of such damages; bankruptcy legislation that displaces a creditor's common law right of action against a debtor with a claim against the debtor's estate does not provide for automatic recovery and does not provide a formula for computing damages. (2) The cause of action displaced in *Crowell* arose on navigable waters of the United States which, like the District of Columbia, are federal enclaves over which Congress has entire control for every purpose of government, and also arose under admiralty law, a subject over which Congress has exclusive authority, and with respect to which the Supreme Court has held federal legislation cannot be enacted that will apply state laws to this occupation, 285 U.S. 22, 40 n. 5, 52 S.Ct. 285, 288 n. 5; the claims and cause of action displaced by bankruptcy legislation generally arise under state law and there is no constitutional prohibition against federal law adopting state law as the rule of decision in such cases. (3) The cause of action involved in *Crowell* was a routine, recurring action under admiralty or maritime law; the claims and causes of action of creditors against a debtor's estate in bankruptcy cases arise under state statutory or common law, vary greatly as to subject matter, and lead into all domains of the law. (4) In *Crowell* the deputy commissioner had no authority to enforce his orders; bankruptcy judges are empowered to enforce their orders.

In *Atlas Roofing Co. v. Occupational Safety Comm.*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977), Congress by enactment of the Occupational Safety and Health Act of 1970 (OSHA or Act), 84 Stat. 1590, 29 U.S.C. § 651 *et seq.*, had created a new cause of action in favor of the Federal Government which permitted the Government proceeding before an administrative agency (1) to obtain abatement orders requiring employers to correct unsafe working conditions and (2) to impose civil penalties on an employer maintaining any unsafe working condition. Following the contest of any such order in an evidentiary hearing before an administrative law judge of the Occupational Safety and Health Review Commission, and before the Commission, an employer could timely petition the appropriate court of appeals for judicial review of the Commission's final and appealable order. The statute limits the scope of judicial review by providing that "[t]he findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record as a whole shall be conclusive." 29 U.S.C. § 660(a).

It was contended that the failure to afford the employer a jury trial on the question of whether he had violated OSHA was in violation of the Seventh Amendment to the United States Constitution which provides for jury trial in most suits at common law. The grant of certiorari by the Supreme Court was limited to this single question.

The Court held:

[A]t least in cases in which 'public rights' are being litigated—e.g., cases in which the Government sues in its sovereign ca-

pacity to enforce public rights created by statutes within the power of Congress to enact—the Seventh Amendment does not prohibit Congress from assigning the fact finding function and initial adjudication to an administrative forum with which a jury would be incompatible.

430 U.S. 442, 450, 97 S.Ct. 1261, 1266.

In response to the argument that Congress could utterly destroy the right to a jury trial by always providing for administrative rather than judicial resolution of a vast range of cases that now arise in the court, the Court said:

> The argument is well put, but overstates the holdings in our prior cases and is in any event unpersuasive. Our prior cases support administrative factfinding in only those situations involving "public rights," e.g., where the Government is involved in its sovereign capacity under an otherwise valid statute creating enforceable public rights. Wholly private tort, contract, and property cases, as well as a vast range of other cases, are not at all implicated.

430 U.S. 442, 458, 97 S.Ct. 1261, 1270.

The Government is seldom involved in a bankruptcy case in its sovereign capacity other than as a creditor, in which instance the Government is generally engaged in one-upmanship, that is, trying to improve its status *vis-a-vis* other creditors or to circumvent the effect of the discharge in bankruptcy with respect to the Government's claim. The Government never appears in bankruptcy cases in the role of enforcer of a public right, if indeed a discharge in bankruptcy is a public right. For this reason alone the cases discussing the scope of judicial review required when the legislature appoints an agency to make findings of fact which are conclusive with respect to matters that are completely within congressional control are simply inapposite.

Congress has not chosen to regulate the entire field of debtor-creditor relations even though it might do so. The nature, extent and validity of counterclaims of a debtor's estate against creditors filing claims, the claims of creditors against a debtor's estate and numerous other matters that arise in core bankruptcy proceedings are determined for the most part by reference to state law. For example, if there should be one hundred claims against a debtor's estate, each claim may arise out of a separate transaction. Some claims may be based on contract, some on tort, some on fraud, the day-to-day grist of matters handled by a state civil court. There is no fountain of administrative knowledge or expertise involved in adjudicating these matters such as might be involved in enforcing other laws of national application such as the National Labor Relations Act, the Clean Air Act, the Occupational Safety and Health Act, or the Federal Insecticide, Fungicide and Rodenticide Act.

Because core bankruptcy proceedings, as for example the motion of the debtor in possession involved in this controversy to assume the leases of the debtor with the defendants, often involve controversies between private parties for which state law provides the initial rule of decision before one reaches issues for which federal law may provide the rule of decision, and because the Government in the form of the bankruptcy court is a passive, impartial arbiter rather than an active participant in those controversies that may involve vindication of rights that arise under federal law, this court rejects the contention of the Government that review of the decision of the bankruptcy judge in core bankruptcy proceedings under the clearly erroneous standard is consistent with Article III.

### C. Custom; Tradition; Stare Decisis

The Department of Justice next argues on several grounds that the adjudication by adjuncts of traditional bankruptcy matters under the 1984 Act accords with Article III.

In support of this argument the Department of Justice cites *White Motor Corp. v. Citibank, N.A.*, 704 F.2d 254 (6th Cir.1983), in which the court observed that "the referees under the Chandler Act and the bankruptcy judges after the 1973 amendments have adjudicated traditional bankruptcy

matters including claims against the estate without constitutional challenge for over a century...." *Id.* at 263.[17] The court's reference to the "1973 Amendments" is apparently intended as a reference to the Bankruptcy Rules which took effect October 1, 1973.

This custom/tradition argument was relied on by Justice White in his dissent in the *Northern Pipeline* case, but in footnote 31 to the plurality opinion in that case the Court said:

Appellants and Justice White's dissent also rely on the broad powers exercised by the bankruptcy referees immediately before the Bankruptcy Act of 1978. See Post [258 U.S.], at 98–103 [102 S.Ct., at 2885–2888], 73 L.Ed.2d, at 632–636. But those particular adjunct functions, which represent the culmination of years of gradual expansion of the power and authority of the bankruptcy referee, see Collier supra n. 3, at ¶ 1.02, have never been explicitly endorsed by this Court....

458 U.S. 50, 78, 102 S.Ct. 2858, 2875.

In *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), the Supreme Court invalidated as violative of the due process clause of the Fourteenth Amendment a Wisconsin statute that permitted prejudgment garnishment of wages without notice and a prior hearing. In his dissenting opinion in that case Justice Black argued that the Court's opinion overruled a number of its own decisions and abandoned legal practices and customs that had been the practice in the states by common consent for many decades. *Id.* at 350, 89 S.Ct. at 1827.

The argument that adjudication of so-called core matters by non-Article III bankruptcy judges is proper simply because it has been "accepted" practice is no more convincing than was the similar argument by Justice Black in his dissent in *Sniadach*, or for that matter the argument that segregation in the public schools and other public places was proper because it had been the "accepted" practice.

We must all recognize that under our system of government unconstitutional practices may continue for long periods of time because those persons most affected thereby are discouraged by lack of resources, by intimidation, or both from challenging the practices.

We are all familiar with *Sniadach* and its progeny, *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); in which the Supreme Court seemingly flip-flopped several times on a constitutional issue within a short span of three years.

One need only take note of counsel of record in the *Sniadach*, *Fuentes*, and *Mitchell* cases and in such cases as *Perez v. Campbell*, 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), to understand why claims against a debtor's estate were adjudicated by non-Article III judges of the bankruptcy courts *without constitutional challenge* prior to and often since the decision of the Supreme Court in the *Northern Pipeline* case. It is unlikely that the *Sniadach*, *Fuentes*, *Mitchell* and *Perez* cases would have reached the Supreme Court had not the debtors been represented by attorneys employed by a legal services agency. Few private practitioners could be persuaded to provide *pro bono* the time and effort required to take to the Supreme Court the *Sniadach* case, which involved wrongful garnishment of wages in the amount of $63.18, or the *Fuentes* case, which involved wrongful repossession of a stove and a stereo, or the *Perez* case, which involved wrongful revocation of the debtors' drivers licenses. Without free legal assistance the cost of any such constitutional challenge is virtually prohibitive. A creditor whose claim in whatever amount will receive payment only on a pro rata basis from an insolvent debtor's estate, and who can seldom if ever qualify for free

---

**17.** See also *In re Kaiser,* 722 F.2d 1574 (2d Cir.1983).

legal assistance, can hardly afford the expense of a constitutional challenge to the propriety of having the amount of the claim determined by a non-Article III bankruptcy judge. That would be spending good money after bad as the saying goes.

Finally, it should be noted that the doctrine of stare decisis, which the Government appears to be invoking in indirect fashion in support of its custom/tradition argument, has only limited application in the field of constitutional law. See cases collected by Brandeis, J., dissenting in *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 407, 408, 52 S.Ct. 443, 447, 76 L.Ed. 815 (1932); *St. Joseph Stock Yards Co. v. U.S.*, 298 U.S. 38, 94, 56 S.Ct. 720, 744, 80 L.Ed. 1033 (1936).

Acknowledgement that certain kinds of controversies that arise in bankruptcy cases traditionally have been referred to adjuncts for final determination is not persuasive because it is inconceivable that tradition based on expediency that has evolved since adoption of the Constitution may be given precedence over the plain language of the Constitution.

### D. The Control of Article III Judges Over Bankruptcy Judges and Bankruptcy Cases

The Government next argues that the "unfettered" control over bankruptcy judges and bankruptcy cases conferred on Article III judges by the Bankruptcy Amendments and Federal Judgeship Act of 1984 protects bankruptcy adjudications from encroachments by other branches of government and therefore preserves the fundamental value served by Article III in assuring that the judicial power of the United States reposes in an independent judiciary.

The suggestion that the control retained by Article III judges over bankruptcy judges and bankruptcy cases is "unfettered" is perhaps a little strong and certainly misleading.

### 1. Control Flowing from the Power to Appoint and Remove Bankruptcy Judges

We may begin by comparing the degree of control of the courts over the clerk of the court with their degree of control of the district courts over magistrates and bankruptcy judges.

Each circuit and district court may appoint a clerk who shall be subject to removal by the court. 28 U.S.C. §§ 711(a), 751(a). Thus these courts, and the bankruptcy courts (28 U.S.C. § 156(b)), may be said to have "unfettered" administrative control over the office of clerk of the court.

The control of the district courts and circuit councils over magistrates is somewhat "fettered." Once appointed by the district court or courts unless the office is terminated, a magistrate may be removed during the term for which he or she is appointed "only for incompetency, misconduct, neglect of duty, or physical or mental disability." Removal is ordinarily by the district court, but in the event of a tie vote by the judges of the district court on the question of retention or removal, then removal shall be only by a concurrence of a majority of the judges of the council. Before any order of removal shall be entered, a full specification of the charges shall be furnished to the magistrate, and he shall be accorded by the judges of the removing court, courts, council, or councils an opportunity to be heard on the charges. 28 U.S.C. § 631(i). It is obvious that one purpose of the foregoing statute is to reduce rather than enhance the control of the district court over a magistrate, perhaps to make the position somewhat more attractive to qualified applicants.

Under the Bankruptcy Amendments and Federal Judgeship Act of 1984 the district courts have no direct control over the appointment and removal of bankruptcy judges. Bankruptcy judges are appointed by the United States court of appeals for the circuit to serve as judicial officers of the district court. A bankruptcy judge may be removed during the term for which such judge is appointed, "only for incom-

petence, misconduct, neglect of duty, or physical or mental disability" and only by the judicial council of the circuit, which is *not* composed of the same membership as the appointing court. 28 U.S.C. §§ 152(a) and (e), 332.[18] Before any order of removal may be entered, a full specification of charges shall be furnished to such bankruptcy judge who shall be accorded an opportunity to be heard on such charges. 28 U.S.C. § 152(e). Perhaps the only way the district court may effectuate removal of a bankruptcy judge would be through the action of one or more judges of the court in bringing and prosecuting charges against the bankruptcy judge before the circuit council. In truth, the control of the district court over the appointment and removal of bankruptcy judges is no greater under the Bankruptcy Amendments and Federal Judgeship Act of 1984 than it was under the Bankruptcy Reform Act of 1978. 28 U.S.C. § 152; P.L. 95–598, Nov. 6, 1978, § 201, 92 Stat. 2657. The shifting of the appointment power from the President to the courts of appeals did not operate to give the district courts a greater degree of control over the appointment and removal of bankruptcy judges. The effect of the foregoing statutes is to minimize influence on bankruptcy judges from within as well as from without the Judicial Branch of Government.

The President is authorized to appoint judges of the United States Claims Court for terms of fifteen years. During their term of office these judges may be removed by a majority of the judges of the United States Court of Appeals for the Federal Circuit only for incompetency, misconduct, neglect of duty, engaging in the practice of law, or physical or mental disability. 28 U.S.C. §§ 171, 172, 176. The effect of this appointment and removal scheme is to insulate these judges from undue influence by the Executive, Legislative and Judicial Branches of Government.

The degree of control of Article III judges flowing from the power of circuit courts to appoint and the power of circuit councils to remove bankruptcy judges is nebulous, especially in view of the fact the obvious purpose of the statute in fixing an extended term of office and restricting the power of removal is to reduce the control of the appointing authority over such judges.

Arguing that control inevitably flows from the power to appoint or remove can lead to embarrassing conclusions. For example, a United States Attorney is appointed and is subject to removal by the President. 28 U.S.C. § 541. To what extent does this permit the President to interfere with the prosecution of a case by the U.S. Attorney. In the event of a vacancy in the office of United States Attorney the district court may appoint a United States Attorney to serve until the vacancy is filled. 28 U.S.C. § 546. To what extent does this give the district court control over the office of United States Attorney. The judicial council of the circuit is empowered to appoint a Federal Public Defender for a term of four years, unless sooner removed by the judicial council "for incompetency, misconduct in office, or neglect of duty." 18 U.S.C. § 3006A(h)(2)(A). To what extent does this give the circuit council control over the office of Public Defender or more to the point over the defense of a particular defendant. A designated court, on an appropriate application by the Attorney General, may appoint an independent counsel to prosecute high ranking government officials believed to have committed a violation of any federal criminal law. 28 U.S.C. §§ 591–594. Such independent counsel may be removed from office only by the personal action of the Attorney General and only "for good cause, physical disability, mental incapacity, or any other condition that substantially impairs the performance of such independent counsel's duties." The obvious purpose of this statute is to assure to the greatest extent

---

**18.** The council may be composed of less than all circuit judges in regular active service, and two or three district judges.

possible the independence of independent counsel.

Worth noting is the fact that in recent testimony before the Subcommittee on Monopolies and Commercial Law of the House Judiciary Committee concerning the U.S. Trustee Program the Department of Justice objected to the present limitation on the Attorney General's authority to remove a U.S. Trustee from office contained in section 581(c) of title 28, United States Code. That section provides that each United States Trustee is subject to removal by the Attorney General *for cause.* According to the Department of Justice this restriction on the Attorney General's removal authority impairs his "ability to provide management and policy direction to U.S. Trustees." See Testimony of Arnold I. Burns before the Subcommittee on Monopolies and Commercial Law, Committee on the Judiciary, House of Representatives, March 20, 1986. If the latter is true it must necessarily follow that the broader restriction on the power of the circuit councils to remove bankruptcy judges is an impairment to the administrative control of bankruptcy judges by Article III judges.

The argument of the Attorney General that the statutes vesting the power to appoint bankruptcy judges in the circuit courts, and the power to remove such judges in a different body, the circuit councils, gives Article III judges "unfettered" control over bankruptcy judges not only flies in the face of the intent of Congress in enacting 28 U.S.C. § 152 and similar statutes, but borders on insult to the integrity of the Federal Judiciary in carrying out the various appointive duties assigned to the courts by law because it implies that the power to appoint authorizes the appointing authority to influence initial decisions of the appointee.

The power to appoint officers of the United States, which Congress may vest in the courts of law pursuant to Article II, section 2 of the Constitution, is not necessarily connected with the exercise of Article III judicial power by the court making the appointment. Often a primary reason for vesting the power to make such appointments in the courts is not to vest control of such officers in the court making the appointment, but rather to avoid the partisan political infighting that occurs when it is proposed that the power of appointment be vested in the President.

This court rejects the idea that Article III judges retain control of the judicial power of the United States through exercise under 28 U.S.C. § 152 of choice of the person to whom such powers shall be delegated.

## 2. Control Flowing from the Power of the District Court to Refer or Withdraw a Case or Proceeding

### a. Reference

Under the Bankruptcy Amendments and Federal Judgeship Act of 1984 the district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to cases under title 11 shall be referred to the bankruptcy judges for the district. 11 U.S.C. § 157(a).

It is clear from legislative history that blanket or wholesale reference to bankruptcy judges of all bankruptcy cases and all proceedings arising under title 11 or arising in or related to cases under title 11 by a standing court order or rule was contemplated in much the same manner as reference was accomplished by the so-called Emergency Resolution or Model Rule.

The Emergency Resolution recited that orderly conduct of the business of the court "required" referral of bankruptcy cases and bankruptcy matters to bankruptcy judges because of the administrative difficulty of the district courts' assuming the existing bankruptcy caseload on short notice. Between the date of adoption of the Emergency Resolution and the date of enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984 the bankruptcy caseload increased. Despite the finding of all the circuit councils and all the district courts as a predicate to adop-

tion of the Emergency Resolution that the district courts were not equipped to assume responsibility for the bankruptcy caseload, Congress nevertheless vested the district courts with jurisdiction of bankruptcy cases and proceedings. Congress knew very well the district courts could not assume responsibility for the nearly 600,000 bankruptcy cases and over 100,000 civil actions arising under title 11 or arising in or related to cases under title 11, plus the undocumented but surely in excess of 100,-000 motions pending in such cases and proceedings, on the date of enactment of the Bankruptcy Amendments and Federal Judgeship Act of 1984.[19]

> The sponsor of this legislation stated: Existing bankruptcy judges would assist the district courts in these cases, much like magistrates now help the district court handle criminal and civil cases. The bankruptcy judges would be able to enter final judgments in the 95 percent of the cases that do not require involvement by an Article III judge. In the remaining 5 percent of the bankruptcy cases, the bankruptcy judge would enter a proposed judgment. The district court, after reviewing the record but without holding a second hearing, could promptly enter the final judgment.

Extension of Remarks of Congressman Kastenmeier, 130 Cong.Rec. E1107–08 (daily ed. Mar. 20, 1986).

According to information supplied by the Administrative Office of the United States Courts, some blanket orders of reference were entered on June 27 and June 28, 1984, even before the Bankruptcy Amendments and Federal Judgeship Act of 1984 was passed and signed into law, over 140 general orders of reference were entered in July 1984, and such orders have now been entered in virtually all, if not all judicial districts in the United States.

There might be a modicum of difference constitutionally between wholesale reference of bankruptcy cases and proceedings

to bankruptcy judges by statute under the Bankruptcy Reform Act of 1978 and by court order under the 1984 Act if Congress in good faith had made alternative provision for the handling of such cases and proceedings by the district courts so that reference might be truly discretionary. No such provision was made; wholesale reference by standing order was contemplated, and is an accomplished fact. To conclude there is a basis for distinction between wholesale reference by statute and by court order under such circumstances is to elevate fiction over fact. There is no difference constitutionally between this new reference-by-court-order-charade and the reference-by-statute-charade struck down by the Supreme Court in the *Northern Pipeline* case.

### b. Withdrawal

This court believes the fact that the district court may withdraw, in whole or in part, any case or proceeding referred to a bankruptcy judge, on its own motion or on timely motion of any party, for cause shown, is an irrelevance in any case in which the district court does not do so. *United States v. Raddatz*, 447 U.S. 667, 711, 100 S.Ct. 2406, 2430–2431, 65 L.Ed.2d 424 (1980) (dissenting opinion of Justice Marshall).

> The fact that the judge is permitted to hear the witnesses is an irrelevance in any case in which he does not do so. Moreover the court has emphasized that the vindication of constitutional rights more frequently depends on findings of fact than abstract principles of law. See *Speiser v. Randall*, 357 U.S. [513], at 520, 2 L Ed 2d 1460, 78 S Ct 1332 [at 1339]. And it cannot be seriously suggested that the majoritarian pressures the Framers sought to avoid by the tenure and salary protections of Art III become inapplicable when the relevant question is one of fact.

.    .    .    .    .

---

**19.** *Federal Judicial Workload Statistics During the twelve month period ended September 30, 1985,* prepared by the Administrative office of the United States Courts Statistical Analysis and Reports Division, at 17–20, A–55—A–58.

[T]he replacement of Art III judges with magistrates, even if the replacement extends only to findings of facts, erodes principles that strike at the heart of the constitutional order. In such contexts considerations of administrative cost are least forceful, and the Court must be wary least principles that were meant to endure be sacrificed to expediency....

*Id.* at 711, 714, 100 S.Ct. at 2431, 2432.

The alternatives to the conclusion that the unexercised power of the district court to withdraw a case or proceeding is an irrelevance in determining whether the district court has effective control over the exercise of the judicial power of the United States in a so-called core bankruptcy proceeding involving the adjudication of private rights are: (1) the judges of the district court possess extrasensory knowledge bordering on omnipotence through which they exercise control over controversies in bankruptcy cases of which they are not made consciously aware by pleadings or otherwise, or (2) it is permissible for constitutionally protected state-created rights of third parties affected by a core bankruptcy proceeding to be finally adjudicated by a non-Article III bankruptcy judge, without the consent of the parties, and subject only to traditional appellate review, so long as the litigants have some possibility of access, however remote, to an Article III district court for adjudication of the controversy, through the mechanism of requesting withdrawal.

We presume no district court will ascribe to itself qualities of omnipotence. The control of the district court over a core bankruptcy proceeding of which the court is not made aware by a request for withdrawal or otherwise is no greater than the control of the court over a case pending in a state court between citizens of different states (a potential diversity of citizenship case), of which the court has no knowledge, and with respect to which a petition for removal has not yet been filed. In both instances the control of the district court is potential or theoretical rather than real. We do not believe the fact that the district court re-

tains theoretical control of the judicial power of the United States in so-called core bankruptcy proceedings is sufficient to meet the requirements of Article III.

Upholding a statutory scheme that pretends acquiescence to the requirements of Article III when the obvious purpose of the statute is to circumvent those requirements, in the interest of expediency, would deny the protections of Article III to the largest body of litigants in the federal court system, because a far greater number of citizens are affected by proceedings in the bankruptcy court than in any other court in the federal system.

We are left only with the premises that it is permissible for a non-Article III bankruptcy judge to finally adjudicate both state-created private rights and congressionally-created rights of private parties in so-called core bankruptcy proceedings, without the consent of the parties, and subject only to traditional appellate review, so long as the litigants have some possibility of access, however remote, to an Article III district court for adjudication of the controversy through the mechanism of requesting withdrawal.

Clearly, the power of the district court to withdraw, in whole or in part, any case or proceeding referred to a bankruptcy judge, "for cause shown," by no means assures litigants access to the Article III district court for adjudication of the rights of the parties in a so-called core proceeding, with respect to which the power of the district court to withdraw any such matter is completely discretionary.

Obviously, the withdrawal mechanism is not a sufficient curative for unconstitutional jurisdictional defects. For example, with respect to a *Northern Pipeline* type breach of contract action by the estate against a third party the mechanical process of withdrawal and re-referral is avoided in the 1984 Act by permitting the bankruptcy judge to try any such matter without the consent of the parties and submit recommended findings of fact and conclu-

sions of law to the district court.[20] If withdrawal is not readily available in such a non-core proceeding, it may be virtually impossible to obtain withdrawal in a core proceeding. An allegation that it is unconstitutional for a bankruptcy judge to adjudicate a breach of contract action against the estate, a core matter, would not be grounds for withdrawal because the statute clearly permits such adjudication by a bankruptcy judge, and the issue of unconstitutionality can be raised before the bankruptcy court and preserved for purposes of appeal.

If the absolute right of traditional appellate review by an Article III court of a final adjudication by a non-Article III bankruptcy judge of a state-law based claim or cause of action does not meet the requirements of Article III, how can the existence of the mere possibility that an Article III court may be persuaded to withdraw any such proceeding from a non-Article III bankruptcy judge meet the requirements of Article III.

If withdrawal should be granted on the grounds that adjudication of a core bankruptcy matter by a non-Article III judge is unconstitutional, then it would necessarily follow that all adjudications in matters not withdrawn are unconstitutional, but are nevertheless permissible so long as no one objects. Granting withdrawal on this ground would be tantamount to an admission that the present structure of the bankruptcy court is inherently unconstitutional.

Any court that grants withdrawal to obviate a constitutional issue would necessarily have to set aside as unconstitutional any adjudication of a similar matter by a bankruptcy judge wherein withdrawal was not requested but the issue of constitutionality is raised on appeal.

It would simply be inconsistent to grant withdrawal to obviate a constitutional issue and then to uphold constitutionality when the same issue comes before the court in a separate appeal.

It may be argued that even though the right of traditional appellate review of findings of fact of a bankruptcy judge in core proceedings that involve adjudication of state-law based claims or causes of action does not meet the requirements of Article III, the right to request the district court to withdraw any such proceeding and the right of traditional appellate review, in combination, are sufficient to meet the requirements of Article III. The problem with this argument is that these rights appear to be mutually exclusive. If the district court grants a request for withdrawal, any findings of fact with respect to disputed matters will be adjudicated in the first instance by an Article III court; if the district court denies a request for withdrawal, such denial is an interlocutory order of the district court from which there is no right of appeal. 28 U.S.C. § 1292. The factual and legal grounds on which withdrawal of a core proceeding may be sought can be raised in the proceeding before the bankruptcy court and preserved for purposes of appeal to the Article III district court, but this does not meet the requirements of Article III because in such instance the factual determinations of the bankruptcy judge, unless clearly erroneous, are binding on the Article III court.

**c. Adjunctness**

Clearly, in adjudicating core bankruptcy issues the non-Article III bankruptcy judge does not function as an adjunct of the Article III district court. We have observed that the power of the district court over appointment and removal of bankruptcy judges is minimal or nonexistent. We have also suggested that the indiscriminate blanket reference of all bankruptcy cases and proceedings to bankruptcy judges and the extant but unexercised power of withdrawal of such cases and proceedings merely creates a facade of judicial control

**20.** The only possible way to obtain removal of even a so-called non-core proceeding is through the gimmick of demanding a jury trial, and even that may not be fruitful because of the uncertainty over whether a bankruptcy judge may, without the consent of the parties, conduct a jury trial in such a proceeding.

over the subject matter of a controversy. In final analysis, however, this court does not believe that the power to appoint the adjudicator or to refer or withdraw a case permits relaxation of the requirement that the ultimate determination of facts must be made by an Article III judge when a constitutional right, the right of one citizen asserting a state-law based claim or cause of action against another, or perhaps even when a controversy between private parties based on federal law, is involved.

In *Northern Pipeline*, in discussing the subject of adjunctness, the Supreme Court analyzed only two cases, *Crowell v. Benson*, 285 U.S. 22, 52 S.Ct. 285, 76 L.Ed. 598 (1932), and *United States v. Raddatz*, 447 U.S. 667, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980).

In *Crowell v. Benson*, which involved an admiralty case over which the United States district court had jurisdiction, Congress referred the matter of the employees' claim against the employer directly to the United States Employees' Compensation Commission. The deputy commissioner who adjudicated the claim certainly was not selected by the court; the court had no power to refer the matter to or withdraw the matter from the Commission; the district court had no involvement unless the findings of the Commission were challenged in a suit filed in the district court, in much the same manner as the findings of a bankruptcy judge may be challenged in an appeal to the district court in a core proceeding. In other words, the district court had no administrative control over the assignment of the claim to or the appointment of the initial factfinder.

In *Raddatz*, prior to defendant's trial on federal criminal charges, the district court, over the objection of the defendant, referred to the magistrate for an evidentiary hearing Raddatz's motion to suppress certain incriminating statements he had made to local police officers and to federal agents. The magistrate, finding more creditable the testimony of federal agents repudiating Raddatz's contentions that he had been induced to utter the incriminating

statements through a promise of immunity, recommended that the motion be denied. The defendant filed objections to the magistrate's report. The district court, after considering the transcript, the magistrate's proposed findings of fact and conclusions of law, and after hearing oral arguments of counsel, accepted the magistrate's recommendation, finding that the defendant had voluntarily given the statements sought to be suppressed. In other words, the district court conducted a *de novo* determination of the factual findings of the magistrate. The Supreme Court said—

> We need not decide whether, as suggested by the Government, Congress could constitutionally have delegated the task of rendering a final decision on a suppression motion to a non-Art. III officer. See *Palmore v. United States*, 411 U.S. 389, 36 L.Ed.2d 342, 93 S.Ct. 1670 (1973). Congress has not sought to make any such delegation. Rather, Congress has provided that the magistrate's proposed findings and recommendations shall be subject to *de novo* determination "by the judge ... who then exercise[s] the ultimate authority to issue an appropriate order." S.Rep. at 3. Moreover, "[t]he authority—and the responsibility—to make an informed, final determination ... remains with the judge." *Mathews v. Weber*, 423 U.S. [261], at 271, 46 L.Ed.2d 483, 96 S.Ct. 549 [at 554].

447 U.S. 667, 681, 100 S.Ct. 2406, 2415.

The real issue in the case was whether Raddatz was denied due process by the failure of the district court to rehear the controverted testimony where the decision on the suppression motion hinged entirely on the credibility of witnesses.

In his concurring opinion Justice Blackmun suggested that the degree of supervisory control which the district court has over magistrates should insulate them from outside influence and assure their impartiality as decisionmakers, but further emphasized that even if such is not the case, the Article III district judge is fully able and empowered to correct errors in

the findings of the magistrate. As Justice Blackmun noted—

> we do not face a procedure under which "Congress [has] delegate[d] to a non-Art. III judge the authority to make final determinations on issues of fact.

447 U.S. 667, 686, 100 S.Ct. 2406, 2417. Justice Blackmun does not appear to suggest that supervisory control of the Article III judge over a non-Article III decisionmaker may be a basis for relaxation of the degree of control the district court must exercise over the subject matter of a controversy in order to meet the requirements of Article III. In other words the *Raddatz* case does not support the proposition that administrative control over subordinate non-Article III judicial officers to whom matters are referred for adjudication is an acceptable substitute for plenary review of the factual work product of such judicial officers.

Obviously, constitutionality hinges on the degree of control the Article III district court exercises over the subject matter of a controversy once the court takes cognizance of the matter and not on the degree of administrative control the court may exercise over the case or over a factfinder before the court takes judicial cognizance of a controversy.

The power to appoint the adjudicator or to refer or withdraw a matter is administrative window dressing, mere huffing and puffing in the climb to the rim of the real constitutional question, which is the degree of judicial scrutiny of the handiwork of a non-Article III factfinder that must be exercised by an Article III judge in order to comply with the requirements of Article III when the controversy involves the liability of one private individual to another under either state or federal law.

With respect to so-called core proceedings the extent of review by Article III courts provided on an appeal from a decision of the bankruptcy court is traditional appellate review. This does not meet the requirements of Article III. As Justice Rehnquist put it in his concurring opinion in the *Northern Pipeline* case:

I am likewise of the opinion that the extent of review by Article III courts provided on appeal from a decision of the Bankruptcy Court in a case such as Northern's does not save the grant of authority to the latter under the rule espoused in *Crowell v. Benson*, 285 U.S. 22 [52 S.Ct. 285, 76 L.Ed. 598] (1932). All matters of fact and law in whatever domains of the law to which the parties' dispute may lead are to be resolved by the Bankruptcy Court in the first instance, with only traditional appellate review apparently contemplated by Art. III courts. Acting in this manner the Bankruptcy Court is not an "adjunct" of either the District Court or the Court of Appeals.

458 U.S. 50, 91, 102 S.Ct. 2858, 2882.

### E. The Congressionally-Created Rights Argument

The Government next asserts that "Core Bankruptcy Issues, Which Necessarily Embrace The Adjudication Of Congressionally Created Statutory Rights, Are Uniquely Susceptible To Adjudication By An Adjunct."

As we have previously observed, in and since the decision in the *Northern Pipeline* case, the Supreme Court has rejected the thesis that all congressionally-created statutory rights may be finally adjudicated by a non-Article III judge. *Thomas v. Union Carbide Agric. Products*, 473 U.S. 568, ——, 105 S.Ct. 3325, 3335–36, 87 L.Ed.2d 409, 423 (1985). That thesis is especially inapplicable in proceedings such as bankruptcy proceedings in which the Government is not involved in its capacity as enforcer of a public right.

Moreover, core bankruptcy proceedings do not necessarily involve adjudication of congressionally-created rights; many such proceedings involve adjudication of the rights of the parties as fixed by state law, i.e., the priority of liens under the Uniform Commercial Code, whether the trustee as a judicial lienholder, as a bona fide purchaser, or as a creditor holding an unsecured claim, has rights under state law superior

to the rights of other lienholders or transferees of property of the debtor, whether a lease or executory contract was terminated under state law prior to the intervention of bankruptcy, whether under state law the debtor has an interest in property that becomes property of the estate, whether a creditor's claim against a debtor's estate is valid and enforceable under state law. In these and numerous other instances the Bankruptcy Code simply adopts state law as the federal rule of decision. In adjudicating such matters the bankruptcy judge is adjudicating the liability of one individual to another under state law.

The Government's contention that core bankruptcy issues necessarily embrace adjudication of congressionally-created statutory rights that are uniquely susceptible to adjudication by an adjunct is simply inaccurate.

### F. The Specialization Argument

The Government argues that "Extreme Specialization of Bankruptcy Issues And The Need For Prompt, Expert Adjudications Are Limiting Characteristics That Permit Delegation Without Threat To Article III Principles."

This argument was specifically rejected by the Supreme Court in the *Northern Pipeline* case. We quote.

> The flaw in appellants' analysis is that it provides no limiting principle.... The broad range of questions that can be brought into a bankruptcy court because they are "related to cases under title 11," 28 USC § 1471(b) (1976 ed, Supp IV) [28 USCS § 1471(b)], see supra [458 U.S.], at 54 [102 S.Ct., at 2862], 73 L Ed 2d, at 604, is the clearest proof that even when Congress acts through a "specialized" court, and pursuant to only one of its many Art I powers, appellants' analysis fails to provide any real protection against the erosion of Art III jurisdiction by the unilateral action of the political Branches. In short, to accept appellants' reasoning, would require that we replace the principles delineated in our precedents, rooted in history and the Constitution, with a rule of broad legislative discretion that could effectively eviscerate the constitutional guarantee of an independent Judicial Branch of the Federal Government.
>
> In sum, Art III bars Congress from establishing legislative courts to exercise jurisdiction over all matters related to those arising under the bankruptcy laws. The establishment of such courts does not fall within any of the historically recognized situations in which the general principle of independent adjudication commanded by Art III does not apply. Nor can we discern any persuasive reason, in logic, history, or the Constitution, why the bankruptcy courts here established lie beyond the reach of Art III. (Footnotes omitted).

*Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 73–76, 102 S.Ct. 2858, 2872–2874, 73 L.Ed.2d 598 (1982).

The specialization argument is specious. Claims of creditors against a debtor's estate and against each other in a bankruptcy case are no more specialized than claims of the estate against third parties such as was involved in the *Northern Pipeline* case. Suppose an airline company, a seagoing carrier with a fleet of ships located at ports of call around the world, an oil exploration company that owns leases and drilling equipment located in several states and Mexico, a cattle rancher, a franchisor of a chain of restaurants located in several states, a truck line with certificates of convenience and necessity authorizing it to operate in several states, and a building contractor with an office complex and a residential subdivision under development all file for relief under the Bankruptcy Code on the same day. Adjudication of claims of creditors against these entities can involve such a variety of factual disputes that attribution to the factfinder of specialized knowledge concerning such controversies is untenable, and moreover such factual determinations provide the foundation for resolution of legal disputes that can lead into all domains of the law—inter-

national, admiralty, corporate, commercial, regulatory, state or federal.[21]

## IV. The Views of the Chief Justice

In his separate dissenting opinion in the *Northern Pipeline* case Chief Justice Burger suggests that the Court's holding

> is limited to the proposition stated by JUSTICE REHNQUIST in his concurrence in the judgment—that a "traditional" state common-law action, not made subject to a federal rule of decision, and related only peripherally to an adjudication of bankruptcy under federal law, must, absent consent of the litigants, be heard by an "Article III court" if it is to be heard by any court or agency of the United States. This limited holding, of course, does not suggest that there is something inherently unconstitutional about the new bankruptcy courts; nor does it preclude such courts from adjudicating all but a relatively narrow category of claims "arising under" or "arising in or related to cases under" the Bankruptcy Act.

458 U.S. 50, 92, 102 S.Ct. 2858, 2882.

We do not know what the Chief Justice means when he says the limited holding does not preclude the bankruptcy courts "from adjudicating all but a relatively narrow category of claims arising under or arising in or related to cases under the Bankruptcy Act." As we have previously pointed out claims against the estate gener-

ally arise prepetition and therefore do not arise under title 11 or in a case under title 11. Such claims are related to a case under title 11 as are claims by the estate against third parties. Both kinds of claims may be barred unless timely asserted. 11 U.S.C. §§ 108, 546(a); Bankruptcy Rule 3002. The only readily apparent difference between these two types of state-law based claims is that one is assertable by the estate and the other is assertable against the estate. Surely the Chief Justice is not suggesting that constitutionality hinges on so simple a matter as the alignment of the parties.

For example, let us realign the parties in the *Northern Pipeline* case and suppose that it was Marathon Pipe Line Company that had sued Northern Pipeline Company in a diversity of citizenship action in the Western District of Kentucky seeking damages for alleged breach of contract and warranty, misrepresentation, coercion and duress, extra work orders or quantum meruit.[22]

Upon the intervention of bankruptcy Marathon's action would be stayed and Marathon would be required to present its disputed, unliquidated claim in the bankruptcy court or forego the claim entirely. Suppose Marathon had presented its claim in the bankruptcy case and the debtor, Northern, which had scheduled the claim as a disputed and contingent claim against the debtor, objected to the claim and demanded

---

**21.** *Northern Pipeline Construction Co. v. Marathon Pipe Line Company,* 458 U.S. 50, 91, 102 S.Ct. 2858, 2881–2882, 73 L.Ed.2d 598 (1982).

**22.** In the *Northern Pipeline* case, prior to bankruptcy, the debtor, Northern Pipeline Construction Company, had commenced an action against Marathon Pipe Line Company in the United States District Court for the Western District of Kentucky at Louisville seeking damages for Marathon's alleged breach of contract and warranty, misrepresentation, coercion and duress, extra work orders or quantum meruit. Jurisdiction of that action was grounded on diversity of citizenship and amount in controversy. 28 U.S.C. § 1332. In the action Northern also sought to foreclose a mechanic's lien under Kentucky Revised Statutes § 376.090 pursuant to 28 U.S.C. § 1655. The foregoing action was pending when Northern filed a petition for

relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Minnesota. Northern chose not to pursue its action in the United States District Court for the Western District of Kentucky or to remove the action to the United States bankruptcy court for the district as permitted by 28 U.S.C. § 1478, after which the action might have been transferred to the United States Bankruptcy Court for the District of Minnesota as permitted by 28 U.S.C. § 1475. Instead Northern filed a new action in the United States Bankruptcy Court for the District of Minnesota, asserting in the complaint essentially the same claims for relief asserted in the diversity of citizenship action pending in the United States district court at Louisville. Jurisdiction of the action in the bankruptcy court was grounded on 28 U.S.C. § 1471.

that the claim be disallowed in its entirety by the court.

We are confronted by the fact that the Bankruptcy Code adopts state law as the law to be applied by the court in determining the allowability as well as the amount for which such claim shall be allowed. In denying the claim or in fixing the allowed amount of the claim the bankruptcy court sits in the same posture as a United States district court in a diversity of citizenship case.

Surely constitutionality does not turn on the alignment of the parties, that is, whether a common law cause of action is asserted by the estate against a third party or by a third party against the estate.

Once the allowed amount of the claim is determined there is a federal rule of decision with respect to the amount of distribution on the claim and a federal rule of decision as to the dischargeability of any unpaid portion of the claim. But the initial determination of the allowed amount of the claim requires adjudication of a traditional state common-law action, which is not made subject to a federal rule of decision.

Some have suggested that the action in the *Northern Pipeline* case was an *in personam* action by the estate against a third party. However, one could just as well argue that the suit was an *in rem* action by the estate to determine the validity, nature and extent of and to enforce the trustee's statutory lien on a receivable of the debtor. 11 U.S.C. §§ 541, 542(a), 544(a).

The filing of a petition for relief under the Bankruptcy Code operates as a collective execution upon "all legal and equitable interests of the debtor in property" for the benefit of general creditors of the debtor in much the same manner as a notice of federal tax lien filed in accordance with 26 U.S.C. § 6323(f) operates as a lien "upon all property and property rights" of a taxpayer in favor of the government. 11 U.S.C. §§ 541, 544(a); 26 U.S.C. § 6321.

The Supreme Court has ruled that state law controls in determining the nature of the legal interest which a taxpayer has in property claimed to be encumbered by a federal tax lien.

The threshold question in this case, as in all cases where the Federal Government asserts its tax lien, is whether and to what extent the taxpayer had "property" or "rights to property" to which the lien could attach. In answering that question both federal and state courts must look to state law, for it has long been the rule that "in application of a federal revenue act, state law controls in determining the nature of the legal interest which the taxpayer had in the property ... sought to be reached by the statute. *Morgan v. Commissioner*, 309 U.S. 78, 82, 60 S.Ct. 424, 426, 84 L.Ed. 585. Thus, as we held only two Terms ago, Section 3670 "creates no property rights but merely attaches consequences, federally defined, to rights created under state law ..." *United States v. Bess*, 357 U.S. 51, 55, 78 S.Ct. 1054, 1057, 2 L.Ed.2d 1135. However, once the tax lien has attached to the taxpayer's state-created interests, we enter the province of federal law, which we have consistently held determines the priority of competing liens asserted against the taxpayer's "property" or "rights to property." [citations omitted]. The application of state law in ascertaining the taxpayer's property rights and of federal law in reconciling the claims of competing lienors is based both upon logic and sound legal principles. This approach strikes a proper balance between the legitimate and traditional interest which the state has in creating and defining the property interests of its citizens, and the necessity of uniform administration of the federal revenue statutes.

*Acquilino v. United States*, 363 U.S. 509, 512–14, 80 S.Ct. 1277, 1279–81, 4 L.Ed.2d 1365 (1960).

The Bankruptcy Code, like the federal tax lien statute, creates no property rights, but merely attaches consequences, federally defined, to rights created under state law.

Resolution of a state law issue may obviate the need for application of federal law or, as is more often the case, is a prerequisite to the overlay of federal law.

In *NLT Computer Services Corporation v. Capital Computer Systems, et al.*, 755 F.2d 1253 (6th Cir.1985), NLT commenced an interpleader action in the U.S. district court seeking a determination as to the priority of liens in the sum of $150,000 which NLT admittedly owed to Capital as the balance remaining due on a purchase contract for certain computer software and licenses. Named as defendants in addition to the taxpayer, Capital, were the United States, which claimed the monies due were subject to a recorded government notice of tax levy, Richard Distributing Company, a judgment creditor of Capital that had caused a garnishment to issue against the account receivable, and Gallo Sales Company, which claimed a perfected security interest in the receivable owed to Capital by NLT. On the morning of the date set for trial of the interpleader action, the defendant Richard Distributing Company and one or more other creditors filed an involuntary petition in bankruptcy against Capital. After concluding that the receivable, even though overencumbered, was property of the debtor's estate, the distribution of which was to be determined by the bankruptcy priorities, the court said:

> The only purpose of the interpleader action was to determine the ownership of the funds, for the plaintiff therein made no claim to the money and did not dispute its legal obligation to pay. Therefore, the interpleader court's only function was the same as that which is vested in the bankruptcy court under the Bankruptcy Code, that is, to determine the relative priority of competing claims to the fund. As stated earlier, the constitutional requirement that this function be performed by an Article III judge rather than a bankruptcy judge does not, in our judgment, impair the central purpose and plan of the bankruptcy statute. The fact that the interpleader action was pending in the same district court in which the bankruptcy proceedings were filed tends

to blur but does not remove the distinctions between the forums, distinctions which would otherwise have been so apparent had the interpleader action been pending in a state court or a different United States district court. We further observe, if only tentatively, that where, as here, there are competing claims to the property of a bankrupt, it was Congress' probable intent to allow the adjudication of such competing claims and priorities under the Bankruptcy Act within the framework of the bankruptcy proceedings themselves to the extent that they constitutionally could be heard. However, that adjudication probably must be heard by an Article III judge, unless the parties stipulated otherwise, or in some other proceeding consistent with *Northern Pipeline*.

*NLT Computer Systems, Inc. v. Capital Computer Systems*, 755 F.2d 1253, 1263–1264 (6th Cir.1985).

Thus, it cannot be argued, at least in this circuit, that state-law based claims against a debtor's estate may be finally adjudicated by a non-Article III bankruptcy judge without the consent of the parties and subject only to traditional appellate review merely because the claims are asserted against a fund or property in *custodia legis*. If that were so then it would necessarily follow that an interpleader action seeking a determination of the priority of competing claims to monies such as was involved in the *NLT Computer* case, or involving enforcement of a federal tax lien, such as was involved in *Bell & Beckwith v. IRS, et al.*, 766 F.2d 910 (6th Cir.1985), or a suit by a federal agency to foreclose a consensual lien on property likewise may be finally determined by a non-Article III judge. Claimants in a bankruptcy case, like defendants in an interpleader action or a lien foreclosure action, must timely assert or forego their claims entirely, which realistically in any such proceedings should not be viewed as consent to adjudication of claims by a non-Article III judge. The property-in-custodia-legis-theory is not a key to constitutionality of the final adjudi-

cation of state-law based claims by a non-Article III bankruptcy judge without the consent of the parties and subject only to traditional appellate review.

## V. Conclusion

This court is unable to find any case law or logic to support the conclusion that 28 U.S.C. § 157(b)[23] is consistent with Article III of the Constitution. Were this court writing on a clean slate it would unhesitatingly declare this statutory enactment unconstitutional. It is the view of this court that the threat to Article III of the Constitution posed by this legislation is too grave to be brushed aside in the interest of expediency.

The court has written extensively on this matter in the hope and expectation that the district court in this district will reconsider the constitutionality question, or that other courts will be provoked to deeper thought on the subject.

■ With respect to the specifics of the case presently before the court, if the court were to grant the motion of the defendants to remand this declaratory judgment action to the state court this court would still be required to determine the issues raised by the motion of the debtor in possession to assume the leases of the debtor with the defendants. In other words the identical issues raised by the foregoing motion of the debtor in possession and the pleadings in this declaratory judgment action would be subject to being tried in two courts.

The court is of the opinion that the motion of the defendants to remand this declaratory judgment action to the state court should be overruled and that the motion of the debtor in possession to assume the leases of the debtor with the defendants should be set for an evidentiary hearing.

The district court has upheld the constitutionality of 28 U.S.C. § 157(b). This court has invited the district court to recon-

sider, but until the district court indicates otherwise this court should proceed accordingly.

Issues similar to the issues involved in this case arise repeatedly in chapter 11 cases incident to motions of debtors to assume executory contracts or leases with respect to which no action is pending in the state court at the time of commencement of the bankruptcy case.

Abstention with respect to the motion of the debtor in possession to assume the leases of the debtor with the defendants, which is clearly a core proceeding (11 U.S.C. § 365; Bankruptcy Rule 6006), and remand of this civil action to the state court, where resolution of these matters may take an additional three years, in order to moot a challenge to the constitutionality of a federal statute that may be inherently unconstitutional, or in any event unconstitutional in application, is an abdication of responsibility that only the most cynical would condone.

EXHIBIT 1

Office of the Attorney General

Washington, D.C. 20530

May 11, 1984

The Honorable Peter W. Rodino, Jr.

Chairman

Committee on the Judiciary

U.S. House of Representatives

Washington, D.C. 20515

Dear Mr. Chairman:

In March, the House of Representatives joined the Senate in approving bankruptcy courts legislation in response to the Supreme Court's decision in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982). Of course, your committee and this Department supported a separate court established under Article III of the Constitution as the only constitutionally certain alternative to the system struck down in *Northern Pipeline*.

---

**23.** Because a proceeding to assume or reject an executory contract or lease is not specifically mentioned in 11 U.S.C. § 157(b)(2), but never-

theless is within the concept of core proceedings, the constitutionality of subsection (b) in its entirety is at issue.

The legislation subsequently passed by both houses addresses the constitutional defects of the jurisdictional grant of the Bankruptcy Reform Act of 1978 by providing for bankruptcy judges that are intended to be adjunct officers under the control of the district courts. Congress now must be certain it has designed a bankruptcy court system that is both constitutional and workable.

We have reviewed the court procedural provisions approved by the House as Title I of H.R. 5174, and alternative provisions drafted by Senate staff as an amendment to H.R. 5174. We are concerned that the provisions in the Senate staff-level draft may not fully meet the requirements of the Constitution, and will be unduly burdensome to those who must practice regularly in the bankruptcy courts. I am confident that you share our concern that the bankruptcy courts issue not return to Congress two years hence, after another adverse Supreme Court decision. For this reason, we urge the Senate and House to adopt the bankruptcy court procedures contained in Title I of H.R. 5174, with one amendment to help ensure their constitutionality.

Generally, we are concerned that sections 101, 104, and 122 of the Senate staff draft, taken together, create separate courts within the district courts. While the draft presents a closer case than that faced in *Northern Pipeline,* it could present the same problem: that the bankruptcy courts might be construed to be independent entities rather than adjuncts to the district courts.

Specifically, the mandatory referral of cases to bankruptcy judges provided in the Senate draft detracts from the complete discretion of the district courts which characterizes a true adjunct system. The House bill permits the district courts to decide when cases shall be referred. The Senate draft defines and refers to the bankruptcy judges as a "court," while the House bill makes clear that they are a subordinate "unit" of the district court. The purpose of the Senate draft's complex procedures for consent, referral, withdrawal, and re-referral to masters, magistrates, and bankruptcy judges acting as such is to

enable district judges to retain the required "essential attributes of judicial power" while leaving most of the time-consuming work with bankruptcy judges. This is the desired result, but we think it can be achieved much more efficiently by simply specifying the standard of review that will be applied to the work of the bankruptcy judges, as is done in the House bill.

The Senate draft provides for a constitutionally uncertain procedure whereby the consent of a party to the broadest authority of the bankruptcy judge would be implied from the party's failure to object when it files its first pleading. In contrast, the House bill calls for a new consent of all parties to each related proceeding in order for the bankruptcy judge to decide such a related proceeding subject to deferential review. We would expect the consent mechanism in the House bill to be more likely to work in practice. Few parties are likely to consent to a waiver of plenary district court review at the outset of a case, as provided in the Senate draft, when they have no idea what the contested issues will be. Further, we are concerned whether the implied consent provided in the Senate draft would satisfy the due process rights of the parties, particularly when consent is presumed at such an early stage in a bankruptcy case. The House bill appears to require express consent; at any rate, we believe it can be construed to ensure that parties' due process rights have been protected adequately.

While we believe the House bill is preferable for these reasons, both bills may be constitutionally deficient in one important respect. We believe that in order to ensure the validity of any bill providing for adjuncts to handle bankruptcy cases and proceedings, the district judges should have greater authority to review decisions by bankruptcy judges. This would include *de novo* review when it is constitutionally required. Neither the House nor the Senate bill provides for such review in other than related proceedings. While arguments have been made that the referral and withdrawal provisions in both bills allow the district judges to provide the functional equivalent of plenary review, that result is

not clear from the text and legislative history of the bills.

The House bill provides for deferential district court review of bankruptcy judges' decisions in "core" bankruptcy proceedings and *de novo* review of decisions in non-core or "related" proceedings. The Senate draft does something similar, although related proceedings referred to a "special master" are reviewed under a "clearly erroneous" standard. The approach of both bills rests on the assumption that matters of federal law—congressionally created or determined rights—can be adjudicated in the first instance by judicial adjuncts who lack tenure during good behavior. We believe that this assumption is generally correct. It is not clear, however, that the courts will determine that the entire class of core bankruptcy proceedings (or, in the Senate draft, "arising in" and "arising under" proceedings) is the same as the class of proceedings for which limited-tenured officers can make findings of fact subject only to deferential judicial review. *Northern Pipeline* made clear that deferential review was insufficient in related proceedings, but did not reach the issue in other instances. To avoid the possibility that legislation would be found to confer unconstitutional power on limited-tenured adjuncts, an amendment to the preferred House bill seems advisable. An amendment to broaden the authority of the district judges to review rulings by bankruptcy judges in core proceedings is attached.

We are confident of our ability to defend the constitutionality of Title I of H.R. 5174, amended as discussed above. I hope these comments will be useful as Congress finalizes the structure of our nation's bankruptcy court system. I know you share my view of the importance of this endeavor.

Sincerely,

/s/ D. Lowell Jensen

D. Lowell Jensen

Acting Attorney General

Attachment

---

**1.** Although a number of Senators have at one time or another proposed the provisions described herein, we understand that these amendments will be offered by Senator DeConcini, and for ease of expression we refer to them herein as the "DeConcini Amendments." *See* 130 *Cong.Rec.* S7620 (daily ed. June 19, 1984).

*Suggested Amendment*

Add the following at the end of proposed section 158(b) of title 28, which is included in section 104(a) of H.R. 5174:

", except that, where a determination by a bankruptcy judge subject only to such appellate review would violate the Constitution, the district court shall apply such other standard of review or method of determination as shall be consistent with the Constitution."

EXHIBIT 2

U.S. Department of Justice

Office of Legislative and Intergovernmental Affairs

Office of the Assistant Attorney General

Washington, D.C. 20530

June 21, 1984

The Honorable Peter W. Rodino, Jr.

Chairman

Committee on the Judiciary

U.S. House of Representatives

Washington, D.C. 20515

Dear Mr. Chairman:

Now that both Houses have passed bankruptcy legislation, we understand that Senator DeConcini will propose to the conference committee, as a basis for reconciliation, certain provisions [1] drawn from his earlier draft of amendments to H.R. 5174 when it was before the Senate. These relate primarily to the court procedural provisions of the bills. This letter contains the views of the Department of Justice on the most important issues raised by the DeConcini Amendments.

The most significant of the major differences concerns proposed 28 U.S.C. § 1334(c), the abstention provision. Both

the House Bill and the Senate Bill provide for permissive and mandatory abstention to allow for state court adjudication in certain circumstances. The abstention provisions are likely to result in fewer successful bankruptcy cases—success being measured in terms of return to creditors and rehabilitation of debtors—because of increased delays and administrative costs as debtors and trustees pursue or defend actions in disparate locations, splitting up the case and duplicating effort. Any decision to accept these potentially significant costs of abstention should be discretionary with the district court. Moreover, mandatory abstention is not relevant to the constitutional concerns raised about adjunct bankruptcy judges, limits the power of Article III district judges, and unnecessarily complicates bankruptcy procedures, all without providing significant benefits. We would prefer that mandatory abstention be eliminated.

If such a provision is desired, modifications to the bills would be helpful. Accordingly, we support the DeConcini Amendments' change to proposed section 1334(c), which would require abstention only (1) in proceedings brought by the trustee, (2) upon motion of the party against whom the proceeding is brought, (3) if the proceeding can be adjudicated in a timely manner in a state forum, and (4) if such procedure would not be detrimental to the estate.

The principal effect of this amendment would be to make clear that mandatory abstention applies only to related proceedings brought by the trustee against non-creditor third parties, such as that in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982), and not to claims against the estate, even if such claims take the form of a chose in action against the debtor. Certainly, a broad limitation on the ability of the bankruptcy unit to rule on the validity of claims against the estate in bankruptcy cases would have a catastrophic effect on the operation of the bankruptcy court system, for the allowance or disallowance of claims in bankruptcy is the essence of what

bankruptcy judges do. This amendment strikes a proper balance among the need to provide a single forum for the efficient resolution of bankruptcy cases (the primary goal of the Bankruptcy Reform Act of 1978), our federalism principles, and the legitimate expectations of both creditor and non-creditor third parties.

We do not believe that the amendment's express limitation of abstention to related proceedings changes the meaning of either bill in this respect. We regard it as clear that all claims against the estate come within the jurisdiction over proceedings "arising under title 11, or arising in ... cases under title 11", which are not subject to abstention by the terms of section 1334(c) in the House and Senate bills. However, certain interested parties, trial lawyers representing asbestos claimants, have indicated their belief that claims against asbestos manufacturers would be subject to mandatory abstention. Nothing is lost and possibly much is gained by making clear that mandatory abstention applies only to related proceedings like that in *Marathon*.

The DeConcini Amendments delete language in the Senate Bill regarding the relation between abstention and the automatic stay imposed by 11 U.S.C. § 362. However, that language only repeats what is clear from the abstention provision itself and the exclusive *in rem* jurisdiction of the district court in proposed 28 U.S.C. § 1334(d). The DeConcini Amendments adopt the language of the House bill providing that proceedings in state court be adjudicated in a timely manner, rather than merely prosecuted. This would prevent undue delays in the progress of the bankruptcy case.[2] However, the DeConcini Amendments are flawed in one respect. The abstention provision is to be applicable only if the cause of action "will be" timely adjudicated in the state forum. Seemingly, the trustee could resist abstention merely by showing that he, the plaintiff in such a proceeding, would not bring the action in the state forum. If the intent is to force

---

2. We understand that Senator DeConcini also will offer amendments to make clear that mo-

tions regarding withdrawal and abstention are "proper" at the time a party files its first papers

trustees to bring qualifying actions in state fora, the verb in the amendment should be changed to "can be."

Second, proposed section 157(b)(2)(B) of the Senate Bill, unlike the House Bill, excepts from the definition of "core proceedings", and thus from the set of proceedings that bankruptcy judges can determine on their own, "the liquidation or estimation of contingent or unliquidated claims against the estate." The DeConcini Amendments would limit that exception to personal injury torts. Presumably, matters that are not core proceedings are intended to be related proceedings governed by proposed section 157(c). As a policy matter, we believe that the bankruptcy judges are fully capable of liquidating or estimating such claims, and that the system will work more efficiently if the involvement of the district judges is kept to a minimum.

The exception contained in proposed section 157(b)(2)(B) of the Senate Bill, if understood as a reaction to a constitutional difficulty, is not fully responsive in that it addresses a minor, particular difficulty while failing to reach a general, major problem. The difficulty, as Acting Attorney General Lowell Jensen noted in his letter to you of May 11, 1984, is that it is not clear that all of the matters defined as "core proceedings" in the two bills are matters that bankruptcy judges may properly determine subject only to appellate review by district judges under a deferential standard. But while this concern is very serious as a general matter, since it could leave the federal courts without jurisdiction over important parts of bankruptcy cases, it is not especially salient with respect to estimation and liquidation of claims. On the contrary, the bankruptcy judges' power to estimate and liquidate appears very similar to the procedure for the determination of longshoremen's claims upheld by the Supreme Court in *Crowell v. Benson*, 285 U.S. 22 (1932). Accordingly, that power would probably be upheld as appropriate for an adjunct.

It is still true, however, that in general the line between those matters that limited-

in a proceeding, rather than in the case at large.

tenured bankruptcy judges or even executive branch officers could decide on their own and those matters that require the judicial power possessed by district judges is not known with certainty. Rather than have the validity of this bill depend on making a correct guess as to the location of this line, it is preferable to provide the potential for *de novo* review of all matters, or at least those where the parties have not consented to adjudication by a bankruptcy judge. The adoption of the amendment to proposed section 158 suggested in our earlier letter would remove all constitutional doubt in this area.

With respect to estimation and liquidation of claims, we would prefer the complete elimination of the exception contained in the Senate Bill. Recognizing, however, that there is strong support for such an exception, we endorse the DeConcini Amendment and would support any other reasonable middle ground.

Third, proposed section 157(d), as it appears in both the Senate Bill and the House Bill, requires, on proper motion, that the district judge withdraw from the bankruptcy judge and handle himself any proceeding involving federal laws "regulating organizations or activities affecting interstate commerce." On this point we endorse the DeConcini Amendments, which would limit withdrawal to instances where withdrawal would not unduly delay administration of the case. We understand that, when S. 1013 was being drafted, minority members insisted on the addition of this mandatory withdrawal provision to prevent bankruptcy judges, all of whom were expected to be appointed by the incumbent President, from deciding controversial proceedings over the rejection of collective bargaining agreements. *See NLRB v. Bildisco and Bildisco*, 104 S.Ct. 1188 (1984). Now that the Senate and House Bills provide for bankruptcy judges to be appointed by the courts of appeals, the concern that led to the mandatory withdrawal provision no longer arises. Indeed, mandatory withdrawal should be eliminated altogether; a change to limit it to cases where it will be

We support this clarification.

unobtrusive would be a step in the right direction.

The last significant change in the DeConcini Amendments would make the abstention provisions in proposed section 1334(c) inapplicable to pending cases. We note that the changes made by the Bankruptcy Reform Act of 1978 were not made applicable to pending cases, and that a strong case could be made that making these provisions applicable prospectively only would comport with fairness to and the expectations of the parties. We support this change.

We hope these comments will be useful as the conference committee considers the DeConcini Amendments. We would be pleased to discuss any of these matters with you or your staff.

Sincerely,
/s/ Robert A. McConnell
Robert A. McConnell
Assistant Attorney General

cc: All Conference Committee Members

EXHIBIT 3

STATEMENT OF
ADMINISTRATION POLICY

March 20, 1984
House Rules

*H.R. 5174—Bankruptcy Courts Act*
(Rodino, (D) New Jersey)

The Administration supports the badly needed bankruptcy legislation and will work toward improving H.R. 5174 in Conference.

The Administration would oppose amendments that provide limited tenure for bankruptcy judges. Bankruptcy judges appointed for life provide a more certain constitutional course.

\*    \*    \*    \*    \*    \*

This position was written by Upton (OMB/LA), Dolan/McConnell (Justice) and in coordination with Prendergast (WH/LA).